STATE OF CONNECTICUT *v.* ANGEL T.*
(SC 18121)

Rogers, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

Argued February 10—officially released June 30, 2009

*Timothy J. Sugrue,* senior assistant state's attorney, with whom was *Stephen J. Sedensky III,* state's attorney, for the appellant (state).

*Gary A. Mastronardi,* for the appellee (defendant).

*Opinion*

NORCOTT, J. This certified appeal presents us with our first opportunity to determine whether a prosecutor commits impropriety by eliciting evidence of, and commenting during summations about, the fact that the

defendant, Angel T., had obtained representation by an attorney during the police investigation of the crimes at issue. The state appeals, upon our grant of its petition for certification,[1] from the judgment of the Appellate Court reversing the trial court's judgment, rendered after a jury trial, convicting the defendant of two counts of risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (1) and (2), and one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2). *State* v. *Angel T.*, 105 Conn. App. 568, 569, 939 A.2d 611 (2008). On appeal, the state claims that the Appellate Court improperly concluded that the prosecutor had committed impropriety that deprived the defendant of his right to a fair trial by introducing evidence of, and arguing during summations about, the fact that the defendant, while being represented by an attorney, had failed to meet with the police during their investigation of the victim's allegations. We conclude that the prosecutor's questions and comments were inappropriate because they implied that the jury could infer the defendant's guilt from his retention of an attorney during the police investigation, and that these comments deprived the defendant of a fair trial because the state has failed to demonstrate beyond a reasonable doubt that it is not reasonably likely that the jury's verdict would have been different absent the sum total of the improprieties. Accordingly, we affirm the judgment of the Appellate Court.

The Appellate Court's opinion sets forth the following relevant facts and procedural history. "The victim, then age ten, was the defendant's niece, and the defendant lived at the victim's family residence. In July or August,

---

[1] We granted the state's petition for certification limited to the following issue: "Did the Appellate Court properly determine that the state's attorney's elicitation of evidence regarding a missed meeting between the police and the defendant, and his comment thereon in summation, constituted prosecutorial impropriety which deprived the defendant of his right to a fair trial?" *State* v. *Angel T.*, 286 Conn. 907, 907–908, 944 A.2d 979 (2008).

1999, the defendant, on three occasions, entered the victim's bedroom while she was asleep. During the first two occasions, the defendant touched the victim's legs and tried to pull down her pajama pants. Each time the victim kicked the defendant, and he left the room before he succeeded in removing her pants. On the third occasion, the defendant entered the victim's bedroom while she was asleep, pulled down her pajama pants, held her legs tightly and licked and bit her in the vaginal area. After the victim hit and kicked the defendant and called out for her father, the defendant left the room.

"Two days after the third incident, the victim told her parents about the defendant's actions.[2] Her parents confronted the defendant, and, shortly thereafter, he moved out of the residence to New Jersey. No report was made to police at that time. In May, 2004, the victim's mother told a family counselor about the defendant's conduct, and the counselor reported those allegations to the police, who initiated a criminal investigation.

"During the investigation, Bryan Bishop, a police detective, attempted to interview the defendant. Bishop left a telephone message to that effect for the defendant in New Jersey. The following day, Bishop received a telephone call from Ron Sanchez, who identified himself as the defendant's attorney. Sanchez and Bishop scheduled an interview of the defendant by the police, which was to take place at Sanchez' office in New Jersey on July 7, 2004. When Bishop contacted Sanchez on July 6, 2004, to confirm the interview, Sanchez told Bishop that he could no longer make contact with the defendant. As a result of that conversation, Bishop did

---

[2] We note that the victim told her parents of the defendant's conduct after she became uncharacteristically afraid to go to sleep alone in her bedroom. The victim then showed her mother the injury to her vaginal area, which the victim's mother described as a reddish mark with teeth impressions. The victim's older cousin testified at trial that the victim also had told her what the defendant had done, and had shown her the injury as well.

not travel to New Jersey to interview the defendant but later repeatedly called the defendant's telephone number in New Jersey without successfully contacting him.

"At trial, in the state's case, the prosecutor solicited testimony on direct examination from the victim, the victim's mother and the counselor indicating that each individual had given written statements to the police. The prosecutor solicited testimony from Bishop in the state's case that Bishop had taken written statements from the victim, the victim's mother and others. The prosecutor also presented testimony that Bishop had sought a statement from the defendant, whom he had located in New Jersey, but that when Bishop later spoke with Sanchez, Sanchez claimed that he could not contact the defendant.[3]

---

[3] We note the following colloquy took place between the prosecutor and Bishop:

"Q. Okay. Did you ever—in addition to the people that you've already talked about and took statements from, did you ever make any attempts to speak to [the defendant]?

"A. Yes, I did.

"Q. And what steps were those that you took?

"A. I had to—I located him in Elizabeth, New Jersey, and I located—

"Q. How did you locate him?

"A. Through an Internet database of addresses and through the New Jersey department of motor vehicles, I found a driver's license for [the defendant].

"Q. Did the—were the—was the family able to give you any information as to where he might be?

"A. Just within the—the family advised that he lived within the city of Elizabeth, New Jersey. That was all the information they were able to provide.

"Q. Okay. And so then you had to do some tracking down yourself?

"A. Yes.

"Q. Okay. And so what did you do once you found—

"A. I found a telephone number. I used a Spanish speaking detective to leave a message for [the defendant]. I was advised that that party knew him and that he would get the message.

"*The next day I received a telephone call from an Attorney Sanchez from Newark, New Jersey.*

"Q. Okay. And did you try to set up an interview?

"A. Yes, I did. We actually—we had set up an appointment for me to go to Newark on July 7. I requested that [the defendant] come to Danbury, *but the attorney and [the defendant] decided not to come. They said they weren't*

"When the defendant testified in his case on direct examination, he denied sexually assaulting the victim. During his direct examination, the defendant did not testify about giving the police a statement. The prosecutor, however, on cross-examination, asked the defendant about his failure to submit to the police interview in July, 2004. In so doing, the prosecutor asked the defendant why he did not speak with the police. In response, the defendant testified that his attorney's advice was not to speak to anyone about the matter. The defendant testified that his attorney instructed him that he could not talk to anybody and that his attorney would represent him in all matters. In response to the prosecutor's question about whether the lawyer would not let [the defendant] talk to the police even with the lawyer present, the defendant replied in the affirmative, but added that he never talked to the police.[4]

*going to come. On [July] 6, I called down there to confirm the interview and was told that the attorney could no longer make contact with [the defendant].*

"Q. Okay. Did you ever make any attempts to contact [the defendant] yourself after that?

"A. Yes. I had [the Spanish speaking detective] contact that . . . tele-phone number again to leave a message, but no return calls were made.

"Q. So you never got any response?

"A. No." (Emphasis added.)

[4] We note the following colloquy took place between the prosecutor and the defendant during the cross-examination of the defendant:

"Q. *. . . You have a lawyer by the name of Attorney Ron Sanchez?*

"A. *The attorney, Ron Sanchez, was the one who was handling . . . the matter concerning the house.* When the police, the Danbury police, Mr. Julio Lima . . . called my brother's house saying that he wanted to talk to me.

"Q. Okay. The policeman called and wanted to talk to you?

"A. He didn't talk to me.

"Q. No, but you knew that a policeman had called to talk to you?

"A. Yes. Yes.

"Q. *You had your lawyer call the policeman?*

"A. Yes.

"Q. Okay. *Your lawyer made an appointment for you to meet the police-man in New Jersey?*

"A. Yes.

"Q. All right. You never made the appointment?

"Sir, it's a simple yes or no question, okay, did you make the appointment, did you go to it?

"A. I went.

"Q. You went to an appointment with [Detective] Bishop?

"A. Yeah, I went. I went. *The detective called my attorney—let me explain, he called my attorney here on Wednesday and . . . my attorney said no, that they had cancelled the appointment and rescheduled it.*

"Q. The police officer had cancelled the appointment?

"A. That's what my attorney said.

"Q. Okay. And, is there any reason that you can think of why your attorney would lie to you?

"A. No.

"Q. Okay. When did they reschedule the appointment for?

"A. I think he said it was going to be two weeks later or the policeman was going to confirm the date.

"Q. Okay. Did you go to an appointment with the policeman?

"A. The attorney never told me.

"Q. Okay. So, it's your testimony that you were always ready, willing and able to meet with the police officers?

"A. Yeah, because the policeman even had my phone number. *But . . . you know, the laws, when an attorney takes on a case, a policeman can't talk to me. You know, everything—my attorney takes everything, he's in charge of everything.*

"Q. You went through your lawyer is what you're saying?

"A. Yes.

"Q. Okay. . . . Did you know what the Danbury police officer wanted to speak to you about?

"A. When the policeman called, he said that there was some case or some suit pending here in Danbury. He didn't explain to me what, you know, what they were accusing me of.

"Q. You . . . said you never spoke to the police officer?

"A. And so . . . no, my attorney was right next to me, it was, like, he's right next to me and so I was present when he was talking and so the—and so, I was asked for—for my phone number, the address and my name and birth date.

"Q. Okay. And, *Attorney Sanchez, this is your attorney, right?*

"A. He was.

"Q. He was. Okay. So, you heard it—you heard Detective Bishop testify, correct?

"A. No . . . no, Julio Lima.

"Q. No, excuse me. You heard Detective Bishop testify yesterday, the blond hair detective?

"A. Oh, yes, yes, yes, I remember.

"Q. All right. *So, after hearing this testimony, there must be some mix-up with the lawyer?*

"A. When he said . . . the attorney . . . that the appointment was for Wednesday at 10:00 o'clock sharp, I was there present since 9:00 o'clock in my attorney's office. And, my attorney told me that they had cancelled the—the—when the detective—when the detective—when I called, you know, with my—with my attorney, before—before the appointment and the detective said I didn't have a warrant, I didn't have anything. And, my attorney set up an appointment with him to go to New Jersey.

"Q. Okay. You never met with Detective Bishop?

"A. Never. The only thing was . . . when he came to bring me.

"During opening summation, the prosecutor argued that Bishop's failure to meet with the defendant was through no fault of the detective himself. The prosecutor commented that the detective had gathered information from the victim and her family, and also had attempted without success to get information from the defendant.[5] Defense counsel, during summation, did not touch on the police attempts to interview the defendant.

"Q. Well, that was later on when you were arrested, but you never met with them when they wanted to speak with you for whatever reason?

"A. My—my attorney advised me that I couldn't talk to anybody about anything, according to the laws here, that he would assume all—that he would represent me in all matters.

"Q. Okay. So your lawyer told you not to—

"A. The detective—the detective had my number, but they never called me.

"Q. So, your lawyer told you not to talk to the detective?

"A. Well, no, to no one.

"Q. *Your lawyer said to talk to no one?*

"A. With nobody. That he'd—that he'd have to be called for any appointment.

"Q. Okay. *But, your lawyer would not let you talk to a police officer even with him there?*

"A. Oh, yeah. But, I never talked to the policeman.

"Q. Okay. *So, it's your testimony that your lawyer—now, correct me if I'm wrong, okay, it's your testimony that your lawyer was always acting as the go-between?*

"A. He was my representative.

"Q. Okay. And, he always knew how to get a hold of you?

"A. Yes. And, so, yeah, I work, like, three or four blocks from his office.

"Q. Okay.

"A. And, my wife works, like, just a block away.

"Q. And, he was going to let you talk to the police officer with him there?

"A. Yeah. Yeah, because he set up an appointment for me to meet him and the police officer at 10:00 o'clock there.

"Q. And then, apparently, he told you the police officer cancelled?

"A. Yeah." (Emphasis added.)

[5] "In closing argument, the prosecutor stated: 'You have [the victim's] mom, people that you would normally expect her to deal with; her mther, her father, the investigating detective, [Detective] Bishop, who sought to get information from everyone that was involved and was only able, not through [any] fault of the detective himself, but was only able to get it from [the victim] and her family, but he made that attempt to get it from the defendant. . . .

* * *

"'You have Detective . . . Bishop . . . now he's an investigator that talked to a number of witnesses in this case, sought to interview the defen-

"The prosecutor then argued in closing summation that Bishop had wanted to interview the defendant and that there were three versions as to why the interview had not taken place, the defendant's, Sanchez' and Bishop's. The prosecutor argued that Bishop was an impartial investigator reaching out to see what everybody had to say and that Bishop would have benefited from the defendant's interview in evaluating the case. Once contacted by the defendant's attorney, the prosecutor stated that Bishop 'play[ed] it straight up' and tried 'to go through that attorney' but was told that the attorney could not contact the defendant. The prosecutor also stated that Bishop testified that he had received no response when he attempted later to contact the defendant directly.

"Later in closing summation, in discussing the defendant's credibility, the prosecutor pointed out that the defendant was provided with an opportunity to help with the investigation and asked the jury if he elected to do so. The prosecutor remarked that on the witness stand, the defendant gave the impression that it was always someone else's fault because the defendant wanted the interview but that Bishop changed the

---

dant. Now, you have three versions in this area. *You have what the defendant told you about when he was contacted or received knowledge of the contact by the . . . police department. You have the information that Detective Bishop provided you about what the attorney—the defendant's own attorney said.* And, you have the information about what Detective Bishop did. Here, you have an impartial investigator reaching out, wants to see what everybody has to say. All right. Is the defendant mistaken? Is Detective Bishop mistaken? Is the attorney mistaken? What [does] your own common sense and everyday life experience tell you? *Wouldn't it certainly be to Detective Bishop's benefit to have that interview so he can evaluate his case? He went through the attorney. Once he was contacted by the attorney. He kept trying to go through that attorney, playing it straight up.* The attorney says he can't get a hold of [the defendant]. Tries to make other contact, no reply.' " (Emphasis added.) *State* v. *Angel T.*, supra, 105 Conn. App. 571–72 n.2.

appointment."[6] *State* v. *Angel T.*, supra, 105 Conn. App. 569–73.

Thereafter, the jury returned a verdict finding the defendant guilty of one count of sexual assault in the first degree in violation of § 53a-70 (a) (2), and two counts of risk of injury to a child in violation of § 53-21 (1) and (2). The jury, however, found the defendant not guilty of additional charges of one count of attempted sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) (2), and one count of attempted risk of injury to a child in violation of §§ 53a-49 (a) (2) and 53-21 (2). The trial court rendered a judgment of conviction in accordance with the jury's verdict and sentenced the defendant to a total effective sentence of fifteen years imprisonment, execution suspended after ten years, and probation with special conditions including sexual offender evaluation and registration.

The defendant appealed from the judgment of conviction to the Appellate Court, claiming that the prosecutor improperly had questioned him about his failure to meet with the police after they had contacted his attorney, and then commented on that testimony during summations. Id., 573. The Appellate Court, relying on, inter

---

[6] "The prosecutor stated during [his] rebuttal [summation]: 'Then you had the defendant himself; listen to the court's charge about the interest in— that he has in the case. What was his demeanor in court when you saw him? He had an opportunity to help the investigation, ladies and gentlemen. Did he choose to do that? You can believe some, all and or none of any testimony that's given.

" 'Did you get the impression, when you saw him on the witness stand, that made it always be somebody else's fault? You know, I was there, I wanted to talk to—I would have talked to—talked to the police officer, but the appointment was changed. All right. That's putting the blame. And here's the situation that's not concerned with this case, except that he wants to be interviewed about it, but the third party that's involved is Detective Bishop, and they're putting the blame on someone else. Is that consistent with trying to shift blame in a more serious case, in a more serious example?' " *State* v. *Angel T.*, supra, 105 Conn. App. 573 n.3.

alia, *United States* v. *Liddy*, 509 F.2d 428 (D.C. Cir. 1974), cert. denied, 420 U.S. 911, 95 S. Ct. 833, 42 L. Ed. 2d 842 (1975), concluded that "[t]he state's introduction of evidence of the defendant's silence in response to police questioning, on advice of counsel, violated his right against compulsory self-incrimination," and that "the state's introduction of such evidence and the adverse comments at trial on that evidence by the prosecutor were improper."[7] *State* v. *Angel T.*, supra, 105 Conn. App. 576. Employing the six factor analysis from *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987),[8] the Appellate Court also concluded that the prosecutorial impropriety had deprived the defendant of his right to a fair trial because "[t]he case against the defendant was not overwhelming"; *State* v. *Angel T.*, supra, 577; it was uninvited by the defense and "the defendant's refusal to be interviewed by the police [was] a prominent part of the state's case." Id., 578. Accordingly, the Appellate Court reversed the judgment of conviction and ordered a new trial. Id. This certified appeal followed. See footnote 1 of this opinion.

On appeal, the state claims that the Appellate Court improperly concluded that the defendant was deprived

[7] Specifically, the Appellate Court noted that "the defendant, who was a suspect in a criminal investigation, was asked by the police to submit to a police interview . . . [and] has the right, without penalty, to seek and to have the assistance of counsel when interacting with police officers who are seeking an interview." *State* v. *Angel T.*, supra, 105 Conn. App. 574–75. The court then concluded that the state's questioning about the reluctance of the defendant and his attorney to interact with the police, particularly "in contrast to the willingness of other witnesses," suggested "a lack of helpfulness with the impartial police investigation," and "referred negatively to the defendant's decision to retain an attorney." Id., 575.

[8] Under *State* v. *Williams*, supra, 204 Conn. 540, we consider: (1) "the extent to which the misconduct was invited by defense conduct or argument"; (2) "the severity of the misconduct"; (3) "the frequency of the misconduct"; (4) "the centrality of the misconduct to the critical issues in the case"; (5) "the strength of the curative measures adopted"; and (6) "the strength of the state's case."

of a fair trial by the prosecutor's questioning, and his commentary during summations regarding the defendant's having retained counsel and his failure to meet with the police in connection with the case. Relying on, inter alia, *State* v. *Cabral*, 275 Conn. 514, 881 A.2d 247, cert. denied, 546 U.S. 1048, 126 S. Ct. 773, 163 L. Ed. 2d 600 (2005), and *State* v. *Alston*, 272 Conn. 432, 862 A.2d 817 (2005), the state argues that this evidence properly demonstrates the "sequence of the events as they unfolded" in connection with the investigative efforts of the police. The state emphasizes further that its cross-examination of the defendant concerning his missed appointment with the police was permissible because the defendant testified at trial, which meant that, like any other witness, his credibility was subject to impeachment. The state then relies on *State* v. *Santiago*, 100 Conn. App. 236, 917 A.2d 1051, cert. denied, 284 Conn. 933, 935 A.2d 153 (2007), and contends that the comments during summation properly portrayed Bishop's investigation as fair and thorough, and did not constitute an improper invitation for the jury to infer the defendant's guilt on the basis of his decision to consult an attorney. Finally, the state claims that any impropriety that may have occurred was harmless under *State* v. *Williams*, supra, 204 Conn. 540, because, inter alia, it was not severe, as shown by the defendant's failure to object at trial, and the corroborating testimony of the victim's mother and cousin rendered the state's case a strong one.

In response, the defendant, positing that the failure of his trial counsel to object to the prosecutor's questions and comments was "[i]nexplicabl[e]," contends that they were improper because they penalized him for having asserted fundamental constitutional rights, including the right to counsel, the privilege against self-incrimination and the attorney-client privilege. In particular, the defendant relies on *United States ex rel.*

*Macon* v. *Yeager*, 476 F.2d 613 (3d Cir.), cert. denied, 414 U.S. 855, 94 S. Ct. 154, 38 L. Ed. 2d 104 (1973), for the proposition that the prosecutor had committed impropriety by bringing to the jury's attention the fact that the defendant had hired an attorney at the time he was approached by the police for an interview, thereby "subtly suggest[ing]" that "innocent people help the police when requested to do so, and don't need lawyers." Relying on *State* v. *Hull*, 210 Conn. 481, 556 A.2d 154 (1989), the defendant also contends that the "sequence of the events" exception relied upon by the state is inapposite since that exception applies only to persons in custody who, while making a statement to the police, can either change their minds and elect to stop speaking or request counsel, or both; in contrast, the defendant in this case never made a statement to the police of any kind. Finally, the defendant contends that the prosecutorial impropriety deprived him of a fair trial because it was uninvited and pervasive, and the state's case against him was not particularly strong. We conclude that the prosecutor's questioning and commentary were improper and deprived the defendant of a fair trial.

"Before we address the merits of the defendant's claims, we briefly set forth the standard of review and the general framework of the law governing claims of prosecutorial [impropriety]. At the outset, we note that the defendant's trial counsel did not object to the remarks at issue in this appeal. Although these claims are unpreserved, we have recently stated that a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, [213 Conn. 233, 239–40, 567 A.2d 823 (1989)], and, similarly, it is unnecessary for a reviewing court to apply the four-prong *Golding* test. . . . The reason for this is that the defendant in a claim of prosecutorial [impropriety] must establish

that the prosecutorial [impropriety] was so serious as to amount to a denial of due process . . . . In evaluating whether the [impropriety] rose to this level, we consider the factors enumerated by this court in *State* v. *Williams*, [supra, 204 Conn. 540]. . . . The consideration of the fairness of the entire trial through the *Williams* factors duplicates, and, thus makes superfluous, a separate application of the *Golding* test. . . .

"Furthermore, the application of the *Golding* test to unchallenged incidents of [impropriety] tends to encourage analysis of each incident in isolation from one another. Because the inquiry must involve the entire trial, all incidents of [impropriety] must be viewed in relation to one another and within the context of the entire trial. The object of inquiry before a reviewing court in [due process] claims involving prosecutorial [impropriety], therefore, is . . . only the fairness of the entire trial, and not the specific incidents of [impropriety] themselves. Application of the *Williams* factors provides for such an analysis . . . . Accordingly, we apply only the *Williams* factors to unpreserved claims of prosecutorial [impropriety]. . . .

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question that may only be resolved in the context of the entire trial . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 426–28, 902 A.2d 636 (2006).

I

We first consider whether the prosecutor's lines of questioning, and comments thereon during summation, constituted prosecutorial impropriety. Although the Appellate Court has observed that "prosecutors tread on extremely thin ice when they comment on a defendant's decision to consult with counsel"; *State* v. *Santiago*, supra, 100 Conn. App. 247; this case presents us with our first opportunity to consider a claim of prosecutorial impropriety arising from the factual scenario under which a defendant had hired an attorney while claims against him were being investigated by law enforcement officials, but before any custodial interrogation or adversarial criminal proceedings had been instituted.[9] Accordingly, we begin with the seminal decision of the United States Court of Appeals for the Third Circuit in *United States ex rel. Macon* v. *Yeager*, supra, 476 F.2d 614, wherein the defendant had been convicted of manslaughter following an altercation subsequent to a minor automobile accident. During his summation at the defendant's criminal trial, the prosecutor had commented on the defendant's actions after the incident, evidence of which had been elicited during cross-examination, noting that the defendant drove away,

[9] The commencement of custodial interrogation, the provision of warnings pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 489–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and the institution of adversarial criminal proceedings are legally significant events because they lead to the attachment of various specific protections under the fifth and sixth amendments to the United States constitution. See footnote 12 of this opinion. Thus, our analysis is based on cases arising in the context in which the defendant had retained an attorney at a time when those protections had not yet attached.

We also note that the defendant's claims of impropriety in this appeal focus only on the prosecutor's questions and comments with respect to the fact that the defendant had hired an attorney at the time the police were investigating him. The defendant does not cite any case law in support of a claim that it was improper for the prosecutor to rely, for impeachment purposes, on his failure to submit to a prearrest interview standing alone. See also footnote 19 of this opinion.

disposed of the gun, hid his torn shirt, and "[got] up the next morning and lo and behold, what does he do? *He call[ed] his lawyer. These are acts of innocence?"* (Emphasis altered; internal quotation marks omitted.) Id. On appeal, the court agreed with the defendant's argument that "the prosecutor's statement concerning his telephone call to counsel sought, or at least may reasonably be expected to have tended, to raise in the minds of the jurors an inference of guilt and, as a result, penalized him for the exercise of his constitutional right to counsel." Id., 615. Relying on *Griffin* v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965), wherein the United States Supreme Court concluded that a prosecutor's mention of the defendant's failure to testify in his own defense violated the fifth amendment privilege against self-incrimination; see footnote 12 of this opinion; the Third Circuit stated, "we perceive little, if any, valid distinction between the privilege against self-incrimination and the right to counsel. It can be argued, with equal vigor and logical support, as to either the *Griffin* situation or the present case, that a prosecutor's comment seeking to raise in the jurors' minds an inference of guilt from the defendant's constitutionally protected conduct constitutes a 'penalty' on the free exercise of a constitutional right."[10] *United States ex rel. Macon* v. *Yeager*, supra, 615.

---

[10] The Third Circuit further concluded that this prosecutorial impropriety was harmful because there was a " 'reasonable possibility that [it] might have contributed to the conviction.' " *United States ex rel. Macon* v. *Yeager*, supra, 476 F.2d 616, quoting *Fahy* v. *Connecticut*, 375 U.S. 85, 86–87, 84 S. Ct. 229, 11 L. Ed. 2d 171 (1963). In particular, the court noted that "critical portions of the evidence were disputed" and "the credibility of the [defendant] as a witness was a central issue. This is not a situation where the case against the [defendant] was otherwise 'so overwhelming' that the constitutional error did not, beyond a reasonable doubt, contribute to the conviction. . . . The prosecutor's comment concerning [the defendant's] consultation with counsel the day after the shooting incident would appear to have been directed to, and may have had the effect of, raising in the jurors' minds the inference that [the defendant] was, or at least believed himself to be, guilty. Such an inference might certainly tend to cause the

The case law cited in the parties' briefs, as well as our independent research, reveal that the vast majority of the federal and state courts, including our Appellate Court, that have considered this issue have followed *Yeager* and have concluded that prosecutors may not suggest that a defendant's retention of counsel is inconsistent with his or her innocence.[11] The constitutional foundations for these decisions are, however, varied in nature. Some of these courts, including our Appellate Court, base this conclusion on the defendant's rights to counsel under the fifth or sixth amendments to the

---

jury to disbelieve [the defendant's] version of the story." (Citations omitted.) *United States ex rel. Macon* v. *Yeager*, supra, 616–17.

[11] The only exceptions revealed by our research are *United States* v. *Muhammad*, 502 F.3d 646 (7th Cir. 2007), cert. denied, 552 U.S. 1144, 128 S. Ct. 1104, 169 L. Ed. 2d 813 (2008), and *Riddley* v. *State*, 777 So. 2d 31 (Miss. 2000). In *Muhammad*, the United States Court of Appeals for the Seventh Circuit concluded, without addressing any of the case law cited in this opinion, that it was not plain error in violation of the fifth or sixth amendments to the United States constitution for the prosecutor to mention that the defendant had telephoned his attorney when a state trooper stopped his coconspirators' car, which contained a large amount of cocaine. *United States* v. *Muhammad*, supra, 657–58.

In *Riddley* v. *State*, supra, 777 So. 2d 31, the Mississippi Supreme Court was evenly divided, which resulted in the affirmance of the defendant's conviction. The majority of the Mississippi Supreme Court concluded that the prosecutor's comments and questions, which were not objected to at trial, were not of constitutional dimension because the sixth amendment right to counsel had not yet attached prior to the defendant's arrest. Id., 34. The majority emphasized, however, that the prosecutor's comments were improper and that "[a]ny reference to the seeking of legal counsel prior to police involvement in a crime should not be used against a criminal defendant as it would be more prejudicial than probative and should be excluded under the rules of evidence." Id., 35. The majority also concluded that any error was harmless on the basis of the overwhelming evidence against the defendant. Id., 35–36. In response, the dissenting justices concluded that the prosecutor's questioning and commentary about the defendant's prearrest consultation with his attorney "raised an impermissible inference of guilt"; id., 38 (Banks, P. J., dissenting); that violated his fourteenth amendment due process right to consult with counsel, and was not harmless because it might have persuaded the jury to disbelieve the defendant's claim of self-defense. Id., 37–38 (Banks, P. J., dissenting).

United States constitution.[12] See *United States* v. *McDonald*, 620 F.2d 559, 563–64 (5th Cir. 1980) (comment that defendant's attorney was present during execution of search warrant on defendant's house violated sixth amendment), on appeal after remand, 672 F.2d 864 (11th Cir. 1982); *Zemina* v. *Solem*, 438 F. Sup. 455, 465–66 (D.S.D. 1977) (prosecutor's argument that defendant's postshooting call to his attorney was " 'a telling sign' " penalized defendant's exercise of his sixth amendment rights), aff'd, 573 F.2d 1027 (8th Cir. 1978); *State* v. *Santiago*, supra, 100 Conn. App. 244–45 ("A defendant has the right to the assistance of counsel for his defense; that right is secured by the sixth and fourteenth amendments to the United States constitution. Generally, while a prosecutor may invite the jury to draw reasonable inferences from the facts in evi-

---

[12] "The sixth amendment to the United States constitution provides in relevant part: 'In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense.' The sixth amendment right to counsel is made applicable to state prosecutions through the due process clause of the fourteenth amendment." *State* v. *T.R.D.*, 286 Conn. 191, 198 n.8, 942 A.2d 1000 (2008).

In contrast, the right to counsel under the fifth amendment to the United States constitution is attendant to its privilege against self-incrimination, which provides in relevant part "that [n]o person . . . shall be compelled in any criminal case to be a witness against himself." (Internal quotation marks omitted.) *State* v. *Birch*, 219 Conn. 743, 749, 594 A.2d 972 (1991). It differs from the sixth amendment right to counsel because "[t]he purpose of the [s]ixth [a]mendment counsel guarantee—and hence the purpose of invoking it—is to protec[t] the unaided layman at critical confrontations with his expert adversary, the government, after the adverse positions of government and defendant have solidified with respect to a particular alleged crime. . . . The purpose of the [fifth amendment] guarantee, on the other hand—and hence the purpose of invoking it—is to protect a quite different interest: the suspect's desire to deal with the police only through counsel . . . . This is in one respect narrower than the interest protected by the [s]ixth [a]mendment guarantee (because it relates only to custodial interrogation) and in another respect broader (because it relates to interrogation regarding any suspected crime and attaches whether or not the adversarial relationship produced by a pending prosecution has yet arisen)." (Internal quotation marks omitted.) *State* v. *Wallace*, 290 Conn. 261, 270 n.12, 962 A.2d 781 (2009).

dence, he or she may not invite the jury to draw adverse inferences from the fact that a defendant, at any time, retained counsel."); *Henderson* v. *United States*, 632 A.2d 419, 433–34 (D.C. 1993) (prosecutor violated defendant's fifth amendment right to counsel by eliciting testimony and arguing that defendant had sought legal counsel one day after his wife's murder); *Dendy* v. *State*, 896 So. 2d 800, 804 (Fla. App. 2005) (prosecutor violated defendant's sixth amendment right by arguing during summation that defendant's prearrest request for attorney was evidence of consciousness of guilt), on appeal after remand, 954 So. 2d 1221 (Fla. App. 2007); *People* v. *Meredith*, 84 Ill. App. 3d 1065, 1071–73, 405 N.E.2d 1306 (1980) (prosecutor violated defendant's sixth amendment right by commenting that " 'I submit [the defendant] knew that he had shot those people [and] that is why he went to go call his lawyer' "); *State* v. *Marshall*, 123 N.J. 1, 124, 586 A.2d 85 (1991) (prosecutor's commentary about defendant's retention of attorney "impermissibly infringes on a defendant's constitutional right to counsel"), cert. denied, 507 U.S. 929, 113 S. Ct. 1306, 122 L. Ed. 2d 694 (1993); *State* v. *Foth*, Ohio Court of Appeals, Docket No. 95APA12-1621, 1996 Ohio App. LEXIS 3445, *27–30 (August 15, 1996) (prosecutor's argument that defendant changed his story after consulting with counsel subsequent to being contacted by police violated defendant's sixth amendment right); see also *United States* v. *Liddy*, supra, 509 F.2d 444–45 (relying on sixth amendment and concluding that trial court properly instructed jury not to draw adverse inference from defendant's hiring of counsel, but that failure to extend that instruction to time and circumstances of hiring attorney was harmless error).

Other courts base this same conclusion on the more generalized guarantees of a fair trial implicit in the due process clause of the fourteenth amendment to the

United States constitution.[13] They also reason that "a prosecutor is constitutionally precluded from eliciting testimony of a defendant's contacting an attorney and commenting on it on account of the potent tendency of the evidence and comment to serve improperly as the basis for an inference of guilt." *State* v. *Dixon*, 279 Kan. 563, 591, 112 P.3d 883 (2005); id., 592 (defendant's fourteenth amendment right to fair trial was violated by prosecutor's elicitation of evidence, and commentary thereon, that defendant had contacted and met with his attorney shortly after allegedly committing illegal acts); see *Arthur* v. *State*, 575 So. 2d 1165, 1178–80 (Ala. App. 1990) (prosecutor's closing argument deprived defendant of fair trial by implying guilt through relationship with counsel when prosecutor mentioned that defendant was initially represented by same attorney as his accomplice, who had not pursued further appeals of her conviction), cert. denied, 575 So. 2d 1191 (Ala. 1991); *Hunter* v. *State*, 82 Md. App. 679, 683–85, 690–91, 573 A.2d 85 (1990) (comment that defendant, accused drunk driver, had telephoned his attorney, along with emergency assistance, for accident that he had caused, violated fourteenth amendment); compare *Commonwealth* v. *Person*, 400 Mass. 136, 141–42, 508 N.E.2d 88 (1987) (prosecutor improperly argued that defendant's telephone call to attorney shortly after shooting constituted evidence of consciousness of guilt, but not stating constitutional basis for conclusion) with *Commonwealth* v. *Nolin*, 448 Mass. 207, 221–22, 859 N.E.2d 843 (2007) (introduction of evidence of defendant's decision to consult attorney violates fourteenth amendment due process clause).

We agree with those jurisdictions that have concluded that a prosecutor violates the due process clause

---

[13] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

of the fourteenth amendment when he or she elicits, and argues about, evidence tending to suggest a criminal defendant's contact with an attorney prior to his arrest. In our view, this prohibition necessarily is founded in the fourteenth amendment due process assurances of a fair trial under which proscriptions on prosecutorial impropriety are rooted generally.[14] See, e.g., *State* v. *Ritrovato*, 280 Conn. 36, 61–62, 905 A.2d 1079 (2006). Indeed, the sixth amendment right to counsel does not attach until the commencement of adversary judicial proceedings via the filing of the information at arraignment; see *State* v. *Pierre*, 277 Conn. 42, 96–97, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006); and the separate and distinct fifth amendment right to counsel is limited to custodial interrogations by government agents, a situation not implicated in the present case, wherein the defendant had not made *any* statement to law enforcement authorities. See, e.g., *State* v. *Wallace*, 290 Conn. 261, 270–71,

---

[14] "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial. . . .

"[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe." (Internal quotation marks omitted.) *State* v. *Ritrovato*, 280 Conn. 36, 61–62, 905 A.2d 1079 (2006) .

962 A.2d 781 (2009). Thus, because these particularized rights had not yet attached when the defendant contacted his attorney, they are not implicated directly by the prosecutor's conduct in the present case. Nevertheless, we are mindful that " '[m]ost jurors . . . are not schooled in the law' "; *Henderson* v. *United States*, supra, 632 A.2d 433; and that from such "evidence and arguments, a juror might easily draw the inference . . . that it was [the defendant's] idea to seek counsel because he had done something for which he needed a lawyer to defend him." (Internal quotation marks omitted.) Id., 434. Accordingly, we view "[e]vidence of a criminal defendant's consultation with an attorney [as] highly prejudicial, as it is likely to give rise to the improper inference that a defendant in a criminal case is, or at least believes himself to be, guilty."[15] *Martin* v. *State*, 364 Md. 692, 708, 775 A.2d 385 (App. 2005).

Relying on a line of our cases that has applied the United States Supreme Court's decision in *Doyle* v. *Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), which proscribed the use of post-*Miranda*[16] silence or requests for an attorney against a defendant

---

[15] We emphasize further that the exercise of the right to counsel "does not imply a consciousness of guilt. In seeking legal advice or representation, the person may well believe himself culpable of some tortious or criminal conduct. But he may just as well believe himself entirely innocent or only partly culpable, or he simply may not know whether his acts or omissions are in violation of [the] law. And if he has some pre-formed belief as to his culpability or innocence, that belief may turn out to be unfounded. Indeed, common human experience would suggest that, absent some special circumstance not evident here, the most likely purpose for seeking legal advice or representation is to find out what one's status and exposure may be. If there is a rational inference to be drawn from the seeking of such advice or representation therefore, it cannot be more than that—an uncertainty. To draw an inference of consciousness of guilt from the seeking of such advice, then, is both illogical and unwarranted; the fact to be inferred—the consciousness of guilt—is not made more probable (or less probable) from the mere seeking of legal advice or representation, and so evidence of the predicate fact is simply irrelevant." *Hunter* v. *State*, supra, 82 Md. App. 691.

[16] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

at trial,[17] the state contends, however, that the lines of questioning and the prosecutor's commentary during summations were a proper explication of "the investigative effort made by the police and the sequence of events as they unfolded . . . ." (Internal quotation marks omitted.) *State* v. *Cabral*, supra, 275 Conn. 525. This *Doyle* exception, however, is applicable only " 'in certain limited and exceptional circumstances' "; *State* v. *Alston*, supra, 272 Conn. 441; and is not a vehicle for introducing the defendant's silence or request for an attorney for impeachment purposes or as evidence of consciousness of guilt. Rather, this evidence is admissible only when the nature and scope of the police investigation and the defendant's statements in connection therewith are directly at issue.[18] See *State* v. *Montgom-*

[17] "In *Doyle* v. *Ohio*, supra, 426 U.S. 619, the United States Supreme Court held that 'the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment.' 'The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony.' *Wainwright* v. *Greenfield*, 474 U.S. 284, 292, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986)." *State* v. *Alston*, supra, 272 Conn. 440. The rule of *Doyle* also applies to a defendant's request for an attorney after receiving *Miranda* warnings; see, e.g., *State* v. *Hull*, supra, 210 Conn. 491; and similarly precludes the use of post-*Miranda* silence as affirmative proof of a defendant's guilt. See, e.g., *State* v. *Cabral*, supra, 275 Conn. 524. It is undisputed that *Doyle* does not apply in this case because the defendant did not receive *Miranda* warnings prior to engaging in the conduct described herein. See, e.g., *State* v. *Berube*, 256 Conn. 742, 751–53, 775 A.2d 966 (2001). Nevertheless, we find the case law applying *Doyle* to be instructive in this context, which involves similar due process implications attendant to the defendant's prearrest retention of an attorney.

[18] Thus, we agree with the defendant's contention that the cases cited by the state are inapposite because they all involve testimony about statements given by defendants who, while in custody and after having received *Miranda* warnings, decided to stop answering questions or request an attorney while in the middle of giving a statement. See, e.g., *State* v. *Cabral*, supra, 275 Conn. 525–28 (no *Doyle* violation when trial court permitted police officers to testify that defendant initially agreed to speak to police, but then refused to put statement in writing, invoked right to remain silent and requested attorney, and also permitted prosecutor to cross-examine

*ery,* 254 Conn. 694, 716–17 n.30, 759 A.2d 995 (2000) (evidence admitted pursuant to *Doyle* exception is inadmissible for purposes of impeachment or proving affirmative guilt); *State* v. *Hull,* supra, 210 Conn. 490–91 (concluding that state violated *Doyle* by introducing evidence, and emphasizing during summations, that defendant had invoked his right to silence and requested counsel, but had not made any statement to police at time of arrest).

The state's reliance on *State* v. *Santiago,* supra, 100 Conn. App. 236, similarly is misplaced. In *State* v. *Santiago,* supra, 246–47, the Appellate Court concluded that testimony and argument that the defendant had contacted his attorney shortly after the shooting with which he was charged, and then had gone with the attorney to the police, did not violate his right to a fair trial because his own attorney had elicited that testimony, and the prosecutor's argument was a "direct response" to the defendant's argument that he had "done 'the right thing' " by quickly reporting the shooting, which he claimed had been in self-defense. See id. (noting "evidence that the defendant 'ditched' his rifle, left the scene of the shooting, showered, called his attorney and, accompanied by his attorney, gave a statement to the police"). The Appellate Court further emphasized that "the prosecutor in [*Santiago*] did not improperly appeal to the jury to infer guilt from the defendant's having contacted an attorney and having received the counsel

---

defendant about oral statement made to police); *State* v. *Alston,* supra, 272 Conn. 441–45 (no *Doyle* violation when trial court admitted testimony that defendant terminated interview after police confronted him with information indicating that his claimed alibi was false, and permitted state to cross-examine defendant about prior inconsistent statement made to police); *State* v. *Cain,* 25 Conn. App. 503, 517–19, 596 A.2d 449 (1991) (no *Doyle* violation when trial court admitted testimony about police interview that described defendant's reactions to learning that his telephone calls to victim may have been recorded, including his cessation of interview and request for attorney), aff'd, 223 Conn. 731, 613 A.2d 804 (1992).

of an attorney. The prosecutor's specific references to these facts in evidence were isolated and *appear to have been directed at clarifying the sequence of events described by the defendant's counsel as well as the positive inferences that defense counsel invited the jury to draw therefrom.* It would be fundamentally unfair to the state were we to permit the defendant's attorney to comment on the evidence of his conduct after the shooting and to suggest reasonable inferences to be drawn from that conduct, while precluding the state from doing the same in response." (Emphasis added.) Id., 247. *Santiago*, therefore, is inapposite, as the attorney contact in the present case: (1) does not implicate the defendant's conduct that followed the commission of the offense charged; and (2) was not first introduced by the defendant at trial. Accordingly, we conclude that the elicitation of evidence, and the commentary that the defendant, while represented by counsel, had failed to help the police investigation, improperly and impliedly encouraged the jury to infer the defendant's guilt.[19]

---

[19] We emphasize that our conclusion in this appeal is based solely on the prejudicial effect of the admission of, and argument about, the evidence that the defendant apparently had retained counsel in connection with the police investigation of the victim's allegations. This is because evidence of prearrest, and specifically pre-*Miranda*, silence is admissible to impeach the testimony of a defendant who testifies at trial, since the rule of *Doyle* v. *Ohio*, supra, 426 U.S. 619, is predicated on the defendant's reliance on the implicit promise of the *Miranda* warnings. See, e.g., *State* v. *Esposito*, 223 Conn. 299, 318–19, 613 A.2d 242 (1992); *State* v. *Plourde*, 208 Conn. 455, 466–67, 545 A.2d 1071 (1988), cert. denied, 488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989); see also *Jenkins* v. *Anderson*, 447 U.S. 231, 238, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980) ("[I]mpeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial. We conclude that the [f]ifth [a]mendment is not violated by the use of prearrest silence to impeach a criminal defendant's credibility."); *Jenkins* v. *Anderson*, supra, 240 (concluding that use of prearrest silence to impeach defendant's credibility did not violate fourteenth amendment due process clause). We note also that there is a division of authority as to whether the use of a defendant's prearrest silence as substantive evidence of his guilt is constitutionally permissible under the fifth amendment, an issue that we need not consider herein. See, e.g., *United*

## II

Accordingly, we now determine whether the prosecutorial impropriety deprived the defendant of his due process right to a fair trial.[20] Under the well established analysis of *State* v. *Williams*, supra, 204 Conn. 540, we consider: (1) "the extent to which the [impropriety] was invited by defense conduct or argument"; (2) "the severity of the [impropriety]"; (3) "the frequency of the [impropriety]"; (4) "the centrality of the [impropriety] to the critical issues in the case"; (5) "the strength of the curative measures adopted"; and (6) "the strength of the state's case." "In determining whether the defendant was denied a fair trial [by virtue of prosecutorial impropriety] we must view the prosecutor's comments in the context of the entire trial. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citation omitted; internal quotation marks omitted.) *State* v. *Luster*, supra, 279 Conn. 442; see also, e.g., *State* v. *Thompson*, 266 Conn. 440, 460, 832 A.2d 626 (2003) (seminal case articulating standard). Finally,

States v. *Muhammad*, 502 F.3d 646, 657 n.7 (7th Cir. 2007), cert. denied, 552 U.S. 1144, 128 S. Ct. 1104, 169 L. Ed. 2d 813 (2008).

[20] The state acknowledges that it did not brief this portion of the prosecutorial impropriety analysis before the Appellate Court, which left that court without the benefit of the state's views as that court determined whether the prosecutor's improper questions and comments deprived the defendant of a fair trial. Ordinarily, this would constitute abandonment that would preclude the state from raising this point in its subsequent certified appeal. See, e.g., *State* v. *Saucier*, 283 Conn. 207, 222–23, 926 A.2d 633 (2007). We will, however, exercise our discretion to review the state's arguments on this point because they are directed at an integral part of establishing a prosecutorial impropriety claim, and the certified question in this appeal; see footnote 1 of this opinion; specifically addresses this issue, thus eliminating the possibility of unfair surprise to any party. Cf. *State* v. *Robert H.*, 273 Conn. 56, 86, 866 A.2d 1255 (2005) ("the state's [claim on appeal] is not properly before this court because the state did not preserve it for appeal and the claim exceeds the scope of the certified question").

the state bears the burden of demonstrating beyond a reasonable doubt that there is no reasonable likelihood that the jury's verdict would have been different absent the improprieties at issue.[21] See *State* v. *Stevenson,* 269 Conn. 563, 572–74, 849 A.2d 626 (2004) (concluding that prosecutorial misconduct due process analysis under *State* v. *Williams,* supra, 540, embodies fourth prong of *State* v. *Golding,* supra, 213 Conn. 240).

We note at the outset that, with respect to the first *Williams* factor, the state concedes that the defendant

---

[21] We first articulated the "reasonable likelihood" standard for determining whether prosecutorial impropriety deprived the defendant of a fair trial in 2003 in *State* v. *Thompson,* supra, 266 Conn. 460, and that standard has become well established in our prosecutorial impropriety case law. See, e.g., *State* v. *Gould,* 290 Conn. 70, 77, 961 A.2d 975 (2009); *State* v. *King,* 289 Conn. 496, 516, 958 A.2d 731 (2008); *State* v. *Bell,* 283 Conn. 748, 760, 931 A.2d 198 (2007); *State* v. *Warholic,* 278 Conn. 354, 396, 897 A.2d 569 (2006); *State* v. *Spencer,* 275 Conn. 171, 180, 881 A.2d 209 (2005); *State* v. *Ancona,* 270 Conn. 568, 611–12, 854 A.2d 718 (2004), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005). That line of case law does not, however, indicate which party bears the burden of proving the harmlessness of the prosecutorial impropriety, once established, and which level of proof is applicable. Thus, that line of cases must be harmonized with our equally well established decision in *State* v. *Stevenson,* 269 Conn. 563, 572–74, 849 A.2d 626 (2004), wherein we concluded that, "in cases involving incidents of prosecutorial [impropriety] that were not objected to at trial . . . it is unnecessary for the defendant to seek to prevail under the specific requirements of *State* v. *Golding,* [supra, 213 Conn. 239–40] . . . [because] [t]he application of the *Williams* factors . . . is identical to the third and fourth prongs of *Golding,* namely, whether the constitutional violation exists, and whether it was harmful." (Citations omitted; internal quotation marks omitted.) See, e.g., *State* v. *Ritrovato,* supra, 280 Conn. 59 n.17; *State* v. *Warholic,* supra, 361; *State* v. *Ancona,* supra, 591–92. Inasmuch as the fourth prong of *Golding* requires the state to prove that the constitutional violation was harmless beyond a reasonable doubt; see *State* v. *Golding,* supra, 240; we emphasize that the state bears the burden of demonstrating, beyond a reasonable doubt, the harmlessness of the prosecutorial impropriety in a given case. See also *State* v. *Rowe,* 279 Conn. 139, 143, 161–62, 900 A.2d 1276 (2006) (not necessary to reach defendant's claim "urg[ing] this court to adopt a different standard for evaluating claims of prosecutorial [impropriety], under which a finding of prosecutorial [impropriety] would require reversal of a criminal conviction unless the state could prove that the [impropriety] was harmless beyond a reasonable doubt").

did not invite the impropriety. Turning to the second factor, namely, the severity of the impropriety; *State* v. *Williams*, supra, 204 Conn. 540; the state contends that the defendant's failure to object, or to move for a mistrial or curative instructions in response to the prosecutor's questions and comments, belies his contention on appeal that the improprieties were an egregious due process violation. In response, the defendant contends that the impropriety was severe because it was a "direct assault" on the defendant's exercise of his constitutional right to counsel, and the questions and comments implied that he was guilty because he was trying to hide something. With respect to the severity of this impropriety, it is well established that "[w]hen considering whether prosecutorial [impropriety] was severe, this court consider[s] it highly significant that defense counsel failed to object to any of the improper remarks, request curative instructions, or move for a mistrial. . . . A failure to object demonstrates that defense counsel presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Luster*, supra, 279 Conn. 443. Thus, because the defendant failed to object or to seek curative measures at trial, we conclude that this factor supports the state's contention that the prosecutorial impropriety was not particularly severe.

Defense counsel's failure to object at trial is, however, "not by itself fatal to a defendant's claim . . . ." (Internal quotation marks omitted.) *State* v. *Ritrovato*, supra, 280 Conn. 68. Thus, the apparent lack of severity with respect to the impropriety is counterbalanced in part by the third *Williams* factor, namely, "the frequency of the [impropriety]"; *State* v. *Williams*, supra, 204 Conn. 540; which is not specifically addressed by the state. Having reviewed the record, we conclude that the improper questions and commentary were not isolated

in nature. The state elicited the improper evidence through two witnesses, specifically, through its direct examination of Bishop and its cross-examination of the defendant, and then discussed the evidence at length during both its opening and rebuttal summations. Accordingly, the impropriety was not isolated to a discrete part of the trial. See, e.g., *State* v. *Warholic*, 278 Conn. 354, 398, 897 A.2d 569 (2006) ("the instances of prosecutorial misconduct were not isolated because they occurred during both the cross-examination of the defendant and the prosecutor's closing and rebuttal arguments").

The fourth *Williams* factor is "the centrality of the [impropriety] to the critical issues in the case . . . ." *State* v. *Williams*, supra, 204 Conn. 540. The state contends that the questions and comments were not a central part of its case, which focused on the credibility contest between the victim and the defendant, but instead referred to an "ancillary credibility contest" between Bishop and the defendant, specifically, whether to believe Bishop's statement that the interview did not take place because Sanchez' office could not locate the defendant, or the defendant's statement that Sanchez had told the defendant that the police had cancelled the interview. The defendant argues in response that the prosecutor's comments were "devastating" to his credibility generally because they had the effect of informing the jury that the defendant had avoided an interview while using his attorney as a buffer. We agree with the defendant that the impropriety was central to the present case, which turned largely on the credibility of the victim versus that of the defendant, and the impropriety gave the clear impression that the defendant, who was not speaking to the police and had retained an attorney in connection with the investigation, had something to hide.

With respect to the fifth factor, namely, "the strength of the curative measures adopted"; *State* v. *Williams*, supra, 204 Conn. 540; the state concedes that the trial court did not implement any corrective measures directed specifically at the improper questions and comments. We agree with the state, however, that this lack of curative measures is attributable directly to the defendant's failure to object at trial to the improper questions and comments, which means that he "bears much of the responsibility for the fact that these claimed improprieties went uncured. We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument [or cross-examination questions] when [they were] made suggests that defense counsel did not believe that [they were] unfair in light of the record of the case at the time. . . . Moreover . . . defense counsel may elect not to object to arguments [or cross-examination questions] that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to [them] or because he or she wants to later refute that argument [or line of questioning]. . . . The same principles hold true in regard to requests for special instructions. The failure by the defendant to request specific curative instructions frequently indicates on appellate review that the challenged instruction did not deprive the defendant of a fair trial."[22] (Citation omitted; internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 597–98; see also

---

[22] Moreover, we acknowledge that some of the harm from the impropriety might well have been mitigated by the trial court's general instructions that emphasized the jury's role in making credibility determinations, that the credibility of the defendant and the police officer witnesses was to be judged no differently than that of other witnesses and that the attorneys' arguments were not evidence. See, e.g., *State* v. *Stevenson*, supra, 269 Conn. 598.

*State* v. *Ritrovato*, supra, 280 Conn. 68 ("prosecutorial [impropriety] claims [are] not intended to provide an avenue for the tactical sandbagging of our trial courts" [internal quotation marks omitted]).

Finally, we consider the sixth *Williams* factor, namely, "the strength of the state's case." *State* v. *Williams*, supra, 204 Conn. 540. The state, relying on the corroborating testimony of the victim's mother and cousin;[23] see footnote 2 of this opinion; contends that the Appellate Court improperly determined that the state's case was not strong on the grounds that the victim was a minor and there was no physical evidence introduced, as well as the fact that "the jury twice reported to the court that it was deadlocked." *State* v. *Angel T.*, supra, 105 Conn. App. 577. The defendant agrees with the Appellate Court's evaluation of the strength of the state's case,[24] and emphasizes that the jury twice reported to the court that it was deadlocked, and that it did not return a verdict until a full day had passed after the court had delivered a Chip Smith instruction.[25] We conclude that, on the counts of which

---

[23] The state also argues that the plausibility of the victim's allegations is supported by the fact that the delay in reporting was attributable not to the victim, but to her parents, and that the victim's mother did not intend for her disclosure of the victim's allegations to the counselor five years after the abuse had occurred to result in a public prosecution of the defendant; indeed, she became very upset upon learning that would happen.

[24] With respect to the plausibility of the victim's allegations, the defendant emphasizes that the alleged assaults took place in a bedroom next to the bedroom of the victim's parents, and that the jury had to believe that the defendant was able to enter the victim's room—which she testified that she had barricaded with her bed and locked—without waking anyone else who was asleep in the apartment.

[25] "A Chip Smith instruction reminds the jurors that they must act unanimously, while also encouraging a deadlocked jury to reach unanimity. . . . A similar jury instruction, known as an *Allen* charge, is utilized in the federal courts." (Citations omitted; internal quotation marks omitted.) *State* v. *O'Neil*, 261 Conn. 49, 51 n.2, 801 A.2d 730 (2002), discussing *State* v. *Smith*, 49 Conn. 376 (1881); see also *Allen* v. *United States*, 164 U.S. 492, 501–502, 17 S. Ct. 154, 41 L. Ed. 528 (1896).

the defendant was convicted, the state's case was not sufficiently strong so as to not be overshadowed by the impropriety.

"[W]e have never stated that the state's evidence must have been overwhelming in order to support a conclusion that prosecutorial [impropriety] did not deprive the defendant of a fair trial." (Internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 596. Nevertheless, we have described "a child sexual abuse case lacking conclusive physical evidence, when the prosecution's case rests on the credibility of the victim [as] 'not particularly strong,'" even when otherwise sufficient to support a conviction. *State* v. *Ceballos*, 266 Conn. 364, 416, 832 A.2d 14 (2003). Thus, although there exists evidence in the present case supporting the defendant's conviction despite the lack of direct physical evidence linking the defendant to the sexual assault of the victim—namely, the victim's testimony and the testimony of her mother and cousin—"without independent physical evidence to prove that the defendant had sexually assaulted [the victim], or even that [the victim] had been sexually assaulted at all, the significance of the [prosecutor's] improper conduct increases considerably." Id., 416–17. Put differently, even with the testimony by her mother and cousin that the victim had a bite mark on her vaginal area; see footnote 2 of this opinion; there was not sufficient physical evidence to permit the jury to convict this particular defendant without believing the victim's accusations. See *State* v. *Beaulieu*, 274 Conn. 471, 482–83, 876 A.2d 1155 (2005) (noting that victim's credibility remained central issue because bruise on her arm was insufficient physical evidence for state to prevail without believing victim). Moreover, to the extent that the state's case was strengthened by the constancy of accusation testimony of the victim's mother and cousin, which corroborated the existence of her injury and her allegations against

the defendant,[26] the credibility of the victim's mother was subject to question in light of the evidence that she did not have a good relationship with the defendant, even prior to the victim's accusations in the present case.

Furthermore, the multiple reports of jury deadlock indicate that the fact finder itself did not view the state's case against the defendant as particularly strong. See, e.g., *Zappulla* v. *New York*, 391 F.3d 462, 471 (2d Cir. 2004) (considering jury deadlock in habeas petitioner's first trial and lengthy deliberations in second trial in assessing strength of government's case), cert. denied, 546 U.S. 957, 126 S. Ct. 472, 163 L. Ed. 2d 358 (2005); *People* v. *Thompkins*, 195 Cal. App. 3d 244, 251–52, 240 Cal. Rptr. 516 (1987) (rejecting argument that evidence of premeditation was strong because "the jury was deadlocked prior to the judge's statement [concerning premeditation]; necessarily, at least one of the jurors was not persuaded by the strength of the prosecution's evidence"). The jury's deadlock in the present case renders more troubling its split verdict, following the Chip Smith charge, because the split verdict suggests that the jury had doubts concerning the victim's credibility as a general matter, as it failed to credit her testimony about the defendant's earlier attempts to molest her.[27]

[26] See *State* v. *Montoya*, 110 Conn. App. 97, 109, 954 A.2d 193 (noting, in case that lacked physical evidence, that victim exhibited uncharacteristic symptoms of emotional disturbance day after sexual assault), cert. denied, 289 Conn. 941, 959 A.2d 1008 (2008); *State* v. *Dews*, 87 Conn. App. 63, 82, 864 A.2d 59 (describing state's case as "strong" when other victims' testimony corroborated allegations of defendant's sexual misconduct, and testimony of two of victims' mothers, police officer and social worker "further established the consistency of the victims' accusations"), cert. denied, 274 Conn. 901, 876 A.2d 13 (2005).

[27] We acknowledge that previous Connecticut cases have relied on split verdicts as evidence that a jury was not so prejudiced by prosecutorial impropriety that it could not treat the defendant fairly. See, e.g., *State* v. *Ancona*, 270 Conn. 568, 618, 854 A.2d 718 (2004) ("the fact that the jury reviewed each charge separately and found the defendant guilty of some charges but not others strongly suggests that the jury discharged its responsibilities without regard to the improper comments of the [prosecutor]"), cert.

That the jury apparently had some doubts as to the victim's credibility renders even more significant the state's impermissible assault on the defendant's credibility.

Having reviewed all of the *Williams* factors, we conclude that the state has not demonstrated, beyond a reasonable doubt, the reasonable likelihood that the jury's verdict would not have been different absent the sum total of the improprieties in the present case. *State* v. *Luster*, supra, 279 Conn. 442. The prosecutorial impropriety deprived the defendant of a fair trial because it was pervasive, uninvited by the defendant and was not subjected to specific curative measures as a result of what the defendant considers to be the "[i]nexplicabl[e]" failure of his trial counsel to object. Moreover, the lack of physical evidence of sexual assault in the present case rendered it a credibility contest between the defendant and his accusers, and the jury's deadlock, followed by a split verdict, leads us to believe that the state's evidence did not overwhelm the jury, indicating that the jury may well have been unduly influenced by the impropriety. Accordingly, we agree with the Appellate Court's decision to order a new trial in the present case.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005); *State* v. *Ritrovato*, 85 Conn. App. 575, 598, 858 A.2d 296 (2004) ("[t]he split verdict provides ample indication that the jury was not unduly swayed by [expert] testimony regarding [the victim's] credibility as to both incidents or the prosecutor's emphasis of that testimony during closing argument"), rev'd in part on other grounds, 280 Conn. 36, 905 A.2d 1079 (2006). These cases are, however, distinguishable because there is no indication that the split verdicts therein were preceded by jury deadlock.