******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

STATE OF CONNECTICUT *v.* TREIZY LOPEZ
(AC 42146)

DiPentima, C. J., and Lavine and Beach, Js.

*Syllabus*

Convicted, following a jury trial, of attempt to commit robbery in the first
degree and conspiracy to commit robbery in the first degree, the defen-
dant appealed to this court. *Held* that the defendant could not prevail on
his claim that the trial court improperly admitted uncharged misconduct
evidence regarding a separate robbery as the defendant failed to meet
his burden of establishing harmful error: the state presented evidence
beyond the uncharged misconduct evidence that overwhelmingly identi-
fied the defendant, including surveillance video and eyewitness identifi-
cation as well as physical evidence linking the defendant to the gun
that was used in the attempted robbery and the defendant stated to the
police that he and his accomplice had intended to commit robberies
and were present in the store where the attempted robbery took place;
moreover, the trial court instructed the jury several times that the
uncharged misconduct evidence could be considered only for purposes
of identification and a jury is presumed to follow limiting instructions
in the absence of contrary evidence.

Argued November 21, 2019—officially released July 14, 2020

*Procedural History*

Amended information charging the defendant with
felony murder, attempt to commit robbery in the first
degree, and conspiracy to commit robbery in the first
degree brought to the Superior Court in the judicial
district of Fairfield and tried to the jury before *Kava-
newsky, J.*; verdict and judgment of guilty of attempt
to commit robbery in the first degree and conspiracy
to commit robbery in the first degree, from which the
defendant appealed to this court. *Affirmed.*

*Robert L. O'Brien*, assigned counsel, with whom, on
the brief, was *Christopher Y. Duby*, assigned counsel,
for the appellant (defendant).

*C. Robert Satti, Jr.*, supervisory assistant state's
attorney, with whom, on the brief, were *John C. Smriga*,
state's attorney, and *Aaron Simkovitz*, certified legal
intern, for the appellee (state).

*Opinion*

BEACH, J. The defendant, Treizy Lopez, appeals from the judgment of conviction, following a jury trial, of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a) (2), and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2).[1] On appeal, the defendant claims that the court improperly admitted uncharged misconduct evidence of a separate robbery. We conclude that the defendant has not met his burden of establishing harmful error. Accordingly, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On April 11, 2015, the defendant met with his friend, Leighton Vanderberg. They drove to Bridgeport in a light green Ford Focus owned by Vanderberg's wife to "hit a stain to get some money."[2] At approximately 3 p.m., the defendant and Vanderberg entered Sapiao's Grocery store in Bridgeport. The defendant went to the counter, where Maria Salgado (Maria) was located, and Vanderberg went to the back of the store where he confronted Jose Salgado (Jose).[3] Maria testified that the defendant, who was wearing a black mask, pointed a gun at her and told her not to talk or move. Meanwhile, Vanderberg, who also had a gun, approached Jose and demanded that he give him the $900 that Jose was holding. Speaking in Portuguese, Jose requested that Maria retrieve his gun located behind the counter. As she was reaching for the gun, Vanderberg shot Jose three times. Two bullets entered his body, one in the neck and the other in his right upper shoulder, which "went through the muscles of the upper arm and shoulder area and then continued into . . . the chest where it went into the chest cavities and [injured] the right lung, as well as the pulmonary artery . . . and then it continued and it injured the left lung, as well." The bullet that injured the chest and torso was fatal.[4] Thereafter, the defendant and Vanderberg fled the store and drove to New Haven where they planned to commit a second robbery at the Smokin' Wings restaurant.[5]

Officers from the Bridgeport Police Department subsequently were called to the scene at Sapiao's Grocery. During their investigation, the police obtained video surveillance from surrounding stores. The videos revealed that the defendant had purchased items from a nearby market shortly before the robbery. The videos further showed the defendant and Vanderberg entering Sapiao's Grocery, fleeing, and driving away in a green Ford Focus, which had been parked nearby.[6]

The defendant also was identified by a witness who saw the two men flee the store. She testified that "[o]ne of [the men] was tall [with darker skin] and the other . . . was wearing some type of mask. . . . [The man wearing the mask] had light[er] skin. He wasn't too

dark and he wasn't too fair." The witness further described the lighter skinned man as having longer black hair that went down to his neck.

Later that day, New Haven police officers found a gun in a trash can in New Haven. The gun was sent to the state's forensic laboratory for testing. The forensic firearms examiner concluded that the bullets and bullet fragments recovered from Jose's body during an autopsy matched test samples fired from the gun that had been recovered by the New Haven police.[7] The forensic DNA examiner concluded that the defendant was a DNA contributor to samples found on multiple locations on the gun, including the gun's grip, trigger, and hammer.[8]

On April 27, 2015, Bridgeport police detectives arrested the defendant and conducted an interview, which was video recorded, and, ultimately, shown to the jury. During the interview, the defendant admitted to participating in the robbery.[9] The defendant further described the type of gun that he had used during the robbery[10] and what happened to the gun after the robbery.[11] He also admitted to changing his physical appearance after the day of the robbery.[12] The defendant was charged with felony murder in violation of General Statutes §§ 53a-54c, attempt to commit robbery in the first degree in violation of §§ 53a-49 and 53a-134 (a) (2), and conspiracy to commit robbery in the first degree in violation of §§ 53a-48 and 53a-134 (a) (2).

On May 2, 2018, the defendant filed a pretrial motion in limine seeking to preclude the state from presenting "any and all evidence regarding a robbery/shooting investigation of a commercial establishment called 'Smokin' Wings' in New Haven . . . on April 11, 2015 . . . ."[13] He argued that the evidence was irrelevant and unduly prejudicial. The state objected to this motion. On May 15, 2018, after conducting a hearing, the court, *Kavanewsky, J.*, denied the defendant's motion, subject to reargument, stating: "Okay, at this point, I'm going to deny the motion to preclude. . . . [Y]ou've got the Bridgeport homicide, that's the one the defendant is charged with participating in. Very, very close in time, we have the Smokin' Wings [robbery], same day, within a matter of hours. The weapon that was used in the Bridgeport homicide was used in the Smokin' Wings [robbery] and was recovered by the police, identified to be the . . . Bridgeport homicide weapon. There's DNA of the defendant on this weapon.

"In the Smokin' Wings [robbery] there are three perpetrators supposed to be involved, an African-American and two either white or Hispanic.

"Now, the state does not have to prove beyond a reasonable doubt that the defendant participated in the Smokin' Wings [robbery], but yet, I think I have to keep my eye on the ball here, and the question is, is this New

Haven Smokin' Wings incident and the [gun] and the . . . evidence concerning the [gun] relevant to establishing the defendant's guilt in the Bridgeport homicide. I think the answer is clearly it's relevant. It tends to prove a fact that's in issue. It doesn't have to be conclusive but it's relevant and I'll consider a limiting instruction concerning what you may object to being adduced about what happened within Smokin' Wings but I'm not going to just outright preclude that . . . I think all of this is relevant to the charge of the defendant's guilt of the felony murder in Bridgeport . . . . I think it's admissible evidence."

During trial, on May 23, 2018, the state proffered evidence of the Smokin' Wings robbery for the purposes of establishing identity, outside the presence of the jury. The defendant renewed his initial objection to the admission of the evidence. The court concluded that the evidence "should be . . . admitted for purposes of the jury's consideration that the defendant was a perpetrator in the charged offense here in Bridgeport." Evidence regarding the robbery at Smokin' Wings was then presented to the jury.

On May 31, 2018, the defendant was convicted of attempt to commit robbery in the first degree and conspiracy to commit robbery in the first degree.[14] The court sentenced the defendant to a total effective sentence of thirty years of incarceration, ten years of which were mandatory, followed by a period of special parole for five years. This appeal followed.

The defendant claims that the trial court improperly admitted evidence of the separate robbery at the Smokin' Wings restaurant in New Haven. He argues that (1) the evidence of the Smokin' Wings robbery was not relevant or material to any uncharged misconduct exception pursuant to § 4-5 (c) of the Connecticut Code of Evidence, (2) the prejudicial effect of evidence of the Smokin' Wings robbery outweighed its probative value, and (3) the admission of this evidence was harmful error.

We have no need to consider whether the admission of evidence of misconduct at the Smokin' Wings restaurant was improper, because the evidence was emphatically harmless. See *State* v. *Osimanti*, 299 Conn. 1, 18, 6. A.3d 790 (2010) (no abuse of discretion analysis conducted when concluding that trial court's evidentiary rulings were harmless). The evidence was proffered and admitted on the ground that it was relevant to identification, that is, that it tended to show that the defendant participated in the robbery at the Sapiao's Grocery. The court instructed the jurors several times that they could consider the evidence only for the purpose of identification.[15]

Other evidence overwhelmingly established identification. The jury could have found that the defendant's

DNA was on the gun that fired the fatal bullets. Surveillance video and eyewitness' descriptive testimony confirmed the identification. Furthermore, the defendant himself stated to the police and testified that he and Vanderberg had intended to commit robberies and that they were present in Sapiao's Grocery.[16]

The defendant claims evidential rather than constitutional error; he, thus, has the burden on appeal of showing harmful error. "[W]hen an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]e must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]." (Internal quotation marks omitted.) *State v. LeBlanc*, 148 Conn. App. 503, 508–509, 84 A.3d 1242, cert. denied, 311 Conn. 945, 90 A.3d 975 (2014).

The defendant argues that because the jury returned a split verdict, finding him not guilty of the felony murder charge but guilty of both robbery charges, the state's case against him was "close" and, therefore, the admission of evidence of the Smokin' Wings robbery "cannot be said to have *not* substantially affected the verdict." (Emphasis in original.) He argues that, "after carefully considering the evidence, the jury refused to find that all the elements of felony murder were proven beyond a reasonable doubt. . . . The fact that the jury split its verdicts after hearing [evidence of the Smokin' Wings robbery] and considering it to the point that it entered at least one acquittal further shows how close this case was." According to the defendant, the purported weakness in the state's case contributed to the harmfulness of the uncharged misconduct evidence. The defendant does not claim that there was insufficient evidence to support his conviction.

To support his assertion that the jury had doubts concerning the strength of the state's case, the defendant cites *State* v. *Angel T.*, 292 Conn. 262, 294–95, 973 A.2d 1207 (2009).[17] In *Angel T.*, our Supreme Court determined that where there was no physical evidence introduced concerning a sexual assault and the jury twice reported to the court that it was deadlocked in making its decision, "the state's case was not sufficiently strong so as to not be overshadowed by the [harmful error]." Id., 293. The court held: "[T]he lack

of physical evidence of sexual assault . . . rendered it a credibility contest between the defendant and his accusers, and the jury's deadlock, followed by a split verdict, leads us to believe that the state's evidence did not overwhelm the jury, indicating that the jury may well have been unduly influenced by the [harmful error]." Id., 295.

In the present case, the jury reported to the court that it was deadlocked regarding the charge of felony murder. In a note to the court, the jury stated: "[T]he jury has—I think it's found—found consensus on charge two [(attempted robbery)] and [charge] three [(conspiracy to commit robbery)] and is divided on charge one [(felony murder)]. Jury members have indicated unwillingness to change." Shortly before the jury was released for the day, the foreperson indicated that "[he] just would prefer to have redacted the note." He clarified: "I sent it out too early and I don't really want the court to address [it], if that makes sense. . . . I sent the note out premature[ly] and I—I would wish to—to redact it, to take it back and not have the court address it." The next day, the court, acknowledging the note and the foreperson's request, instructed the jury to continue its deliberations. The jury then informed the court that it had reached a consensus on all counts and delivered its verdict.

Although the record discloses that the jury briefly was deadlocked as to one count, there is no indication of deadlock as to the other two counts, or as to identity in any event. There was strong physical evidence linking the defendant to the gun that was used in the robbery, as well as witness identification and the defendant's own admissions. The court instructed the jury to consider the Smokin' Wings evidence, if at all, only on the issue of identification. We presume that the jury followed the instructions of the court. See *State* v. *Paul B.*, 315 Conn. 19, 32, 105 A.3d 130 (2014) (in absence of contrary evidence, appellate courts presume jury followed limiting instruction). A review of the evidence in this case, therefore, shows that the evidence of identification was so strong that any error regarding the admission of evidence concerning Smokin' Wings was inconsequential. The defendant has not met his burden of showing harmful error.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The jury also found that the defendant used a firearm in the commission of the crime of attempt to commit robbery, and his sentence was enhanced by application of General Statutes § 53-202k.

[2] The defendant testified: "A stain means we're going to commit a robbery or just pretty much get in over on anybody. It doesn't necessarily have to be a robbery. It just could be something as easy as, all right, I told you I'm going to do something for you and I got you for your money. Like, you gave me money to do something and—I don't know—like, you [were] going to buy my car and you gave me the money for my car, but in return I didn't sell you the car. I filled out false paperwork. So, pretty much, basically, just scam somebody for money. That could be considered a stain as well. It's

just anything—pretty much anything to get some money that—basically, that's it."

[3] The Salgados owned Sapiao's Grocery.

[4] The medical examiner testified: "I would say that the [bullet] that went through the torso . . . the trunk, and the lungs, that was, clearly, a fatal injury." He further testified: "The cause of death was the gunshot wound of the trunk."

[5] During the police interview, the defendant stated: "[W]e got back to New Haven . . . [a]nd [Vanderberg] was planning on robbing another store."

[6] The vehicle also was identified by Augusto Cesar Manazare, who testified that while he was waiting in his car to do laundry, he saw "[t]wo guys running and . . . going into a [light green] car that was parked in front of [his] . . . house." Although he could not describe the men in detail, he did identify the light green Ford Focus. Referring to the light green Ford Focus, Manazare testified: "That was the car that was parked in front of my house."

[7] The forensic firearms examiner testified: "[A]fter a microscopic comparison of the two items to each other and then to test fires that the laboratory made with this actual firearm there was agreement between the bullets from the test fires, as well as the two evidence bullets. Enough for an examiner to say that, yes, these were fired in this gun."

[8] In regard to the hammer, the forensic DNA examiner testified: "[The defendant] is included as a potential contributor to the major DNA profile from item 3-3G1, which was the hammer. And the expected frequency of individuals who could be a contributor to this major mixture profile is less than one in seven billion in the African-American, Caucasian, and Hispanic population. That's actually our laboratory ceiling. We won't report out a statistic higher than that. We've capped it at one in seven billion because seven billion is approximately the population of the earth."

[9] The defendant stated: "So we were driving around Bridgeport and like, you know, we just going, we just going to get a store. I'm like, but how [are] we [going to] do it? We can't just go in there without having a plan. [Vanderberg's] like, just do it. We're just [going to] do it. You can't think. You think I'm [going to] be there like it's just, I don't even know how to explain it like, it's just . . . we got to the store, we got out. . . ."

He continued: "[Vanderberg] told me, just do it, just do it, this, that and a third. . . . So we go in the store, we both got guns. . . . He [goes] behind the counter, or whatever, I got the gun pointed at the lady. . . . I told her just, don't move, nobody is [going to] get hurt, we just want the money. So she's sitting there, she's not replying to nothing at all. She's just completely quiet and shocked. . . .

"So, next thing you know, the man come, he over here grabbing whatever he grabbing, gunshots go off. After that, we run out the store. . . . I'm like, I'm completely shocked, I don't know what the fuck [is] going on. I'm thinking he got [the] money, we [are about] to be good, everything, we just about to get away. . . .

"We got into the car and we just took off."

[10] The defendant stated: "I had a nine millimeter. . . . It was chrome. . . . [Vanderberg had] a .38 or something."

[11] When questioned about the location of the guns that were used in the robbery, he stated: "I gave it to [Vanderberg]. I really don't know what he did with them. But I'm pretty sure they're gone."

[12] The following colloquy occurred:

"[Detective Curet]: Your hair was different that day, right?

"[Lieutenant Lamaine]: It was like pretty long. And you had a decent looking beard, kind of scruffle thing going. When did you shave the head and the beard?

"[The Defendant]: The same day you talked to me.

"[Lieutenant Lamaine]: That Wednesday morning, that would be the Wednesday after the homicide."

[13] The motion did not seek to preclude the physical evidence regarding the gun recovered by the New Haven police. During the hearing on the motion, defense counsel stated: "I think my objection is really—it's not the recovery of the firearm or any subsequent testing . . . . I understand that the court is going to allow the firearm . . . but as far as [what occurred] inside the store, that would really be my specific objection because the person in the store cannot tell . . . who fired the firearm . . . . I'm asking the court to limit that testimony, more so than the actual physical recovery of the firearm . . . because the owner . . . of that store could not say who it was."

[14] The jury found the defendant not guilty of the felony murder charge.

[15] The court gave the following limiting instruction at the time the evidence was admitted: "You may not consider the Smokin' Wings evidence as establishing a predisposition on the part of the defendant to commit any crime charged or to demonstrate criminal propensity. You may consider such evidence if you believe it and further find it logically and rationally supports the issue for which its being offered by the state, but only as it may bear on the issue of the identity of the defendant in the Bridgeport homicide. So you can consider this evidence of the New Haven matter if you believe it and only for purposes of your consideration of identity of the defendant in the Bridgeport homicide."

When charging the jury, the court also stated: "The state . . . offered [evidence of the Smokin' Wings robbery] . . . as an alleged act of misconduct of the defendant as it [may] bear upon your consideration of the identity of the defendant as a perpetrator of the crimes charged in this case. You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you believe it and further to find that it logically and rationally supports the issue for which it is being offered by the state, but only as it may bear on the issue of identity of the defendant in the Bridgeport matters. On the other hand, if you do not believe such evidence, or even if you do, if you find that it does not logically and rationally support the issue for which it is being offered by the state—namely, the identity of the defendant—then you may not consider such [evidence] for any other purpose." We presume that the jury followed the instructions of the court.

[16] The following examination transpired between the prosecutor and the defendant at trial:

"Q. And the store that you're talking about, is that Sapiao's Grocery store?

"A. Yes. It is.

* * *

"Q. And what happens inside the store?

"A. I mean, I walk in the store, [Vanderberg] runs around the counter, and the next thing you know I just hear arguing. . . .

* * *

"Q. And what happens next?

"A. I just heard gunshots. Like, I heard the arguing. . . . But I didn't necessarily hear everything. . . . [T]he main things I remember was just give me the money or I'mma shoot you.

* * *

"Q. Okay. So, you hear a shot and what do you do?

"A. I froze up. I was completely in shock. . . . I didn't know what to do. Like, I didn't even know what was happening. I thought the lady got shot, but then I [saw] a man and the man was coming because I couldn't see. Like, I knew Vanderberg . . . was arguing with somebody, but I thought, like—I don't know. I just couldn't tell who he was arguing with. I didn't know what was going on until after the fact when the shots went off and there was a man in front of me. And he was, like, clutching his neck and his chest."

[17] The defendant also cites *State* v. *Sawyer*, 279 Conn. 331, 359–60, 904 A.2d 101 (2006), overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008), to support the proposition that the state's case was not particularly strong. In *Sawyer*, which involved a sexual assault, our Supreme Court held that when there is a lack of physical evidence of the sexual assault, the state does not have a strong case and the admission of uncharged misconduct is harmful. Id., 359. The present case is distinguishable from *Sawyer*. Here, there is an abundance of physical evidence linking the defendant to the robbery as well as the defendant's admissions. As such, *Sawyer* does not apply.