[Cite as *State v. Reid*, 2026-Ohio-1764.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                    :

    Plaintiff-Appellee,          :

                          Nos. 115108 and 115290

    v.                              :

AUSTIN D. REID,                   :

    Defendant-Appellant.        :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED AND REMANDED
**RELEASED AND JOURNALIZED:** May 14, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-691912-A

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Christine M. Vacha, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Jennifer J. Pritchard, Assistant Public Defender, *for appellant.*

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant Austin D. Reid ("Reid") appeals his convictions and sentence. He claims the following errors:

1. Appellant's convictions were against the manifest weight of the evidence.

2. The trial court erred by failing to provide a self-defense jury instruction, in violation of the appellant's rights under the Fifth and Sixth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

3. The trial court erred by permitting the state to introduce the contents of Mr. Reid's cellular telephone extraction.

4. The trial court violated appellant's right to a fair trial when the state was allowed to elicit testimony that appellant sought counsel prior to his arrest in violation of his Sixth Amendment right.

5. The trial court erred in sentencing Mr. Reid when it failed to properly allocate the appropriate amount of jail[-]time credit.

6. The cumulative errors committed during the trial deprived the appellant of a fair trial.

{¶ 2} We affirm Reid's convictions but remand the case to the trial court to calculate jail-time credit.

## I. Facts and Procedural History

{¶ 3} Reid was charged with one count of murder in violation of R.C. 2903.02(B) (Count 1), two counts of felonious assault in violation of R.C. 2903.11(A)(1) and 2903.11(A)(2) (Counts 2 and 3), one count of domestic violence in violation of R.C. 2919.25(A) (Count 4), one count of improperly discharging a firearm at or into a habitation or a school or safety zone in violation of R.C. 2923.161(A)(1) (Count 5), one count of discharging a firearm on or near a prohibited premises in violation of R.C. 2923.162 (Count 6), one count of intimidation of an attorney, victim or witness in a criminal case in violation of R.C. 2921.04(B)(2) (Count 7), and one count of having weapons while under

disability in violation of R.C. 2923.13(A)(2) (Count 8).  The charges were brought in connection with the shooting death of Kneina Scott ("Kneina") on November 22, 2023.

{¶ 4} Prior to trial, defense counsel filed a motion for relief from prejudicial joinder.  The trial court granted the motion and severed Counts 5 through 8 from Counts 1 through 4.  The case subsequently proceeded to a jury trial on Counts 1 through 4.

{¶ 5} Shirley Scott ("Scott") testified at trial that she had been dating Reid for approximately two years prior to the events giving rise to this case.  Scott and Reid went out together on the night of November 21, 2023, and later returned home to Scott's home, which was located in the area of East 136th Street and Caine Avenue in Cleveland.  Scott and Reid had a "volatile" relationship, and they began arguing in the early morning hours of November 22, 2023.  Scott asked Reid to leave her house because she was departing soon for Detroit, Michigan, but he refused.  (Tr. 223-224.)  The argument turned physical, and Scott's sister, Kneina, arrived while Scott and Reid were in the midst of a physical altercation.  Kneina held a knife and ordered Reid to "get off my sister."  (Tr. 231 and 277.)  Kneina's appearance at the residence provided a break in the fighting that allowed Scott to move away from Reid.

{¶ 6} Scott, who had just taken a bath, was not yet dressed.  She took a revolver out of its lockbox, pointed at Reid, and told him, "[I]f [he] touch[ed] my sister or me I would have to shoot him" and "please leave my house."  (Tr. 231.)

Thereafter, Scott, Kneina, and Reid walked out of Scott's second-floor apartment to the outside. After watching Reid walk down the driveway and cross the street, Scott went back upstairs to get dressed.

{¶ 7} Reid returned to the residence before Scott had time to get dressed. Reid called out, "[C]ome, bitches." (Tr. 237.) Scott looked out her kitchen window and observed Reid exiting his car, which he had just parked on her front lawn. (Tr. 237.) Scott again told Reid to leave. Scott picked up her revolver and "shot it in the air" from her upstairs window. (Tr. 237.) She testified that she only fired one shot from her weapon as a "warning shot" and that she did not point it at Reid. (Tr. 280-281.) Scott explained that she had asked Reid to leave many times and that "[she] even broke up with him," but he refused to leave. (Tr. 281.)

{¶ 8} When Scott shot the revolver, Kneina, who had been "bent in the car," stood up and shook her head at Scott. (Tr. 239.) Meanwhile, Reid took a firearm and shot it twice at Scott, who was in an upstairs window. (Tr. 239-240.) Scott ducked inside the house to avoid being shot. She then heard another gunshot and glass shatter. (Tr. 239-240.) Scott looked out her upstairs window, saw Kneina laying on the ground, and ran downstairs to see her. Scott found Kneina's phone and called 911. (Tr. 242.)

{¶ 9} While Scott spoke with the 911 dispatcher, she and Reid put Kneina in the back seat of her gray Nissan Rogue and drove her to Marymount Hospital, a Cleveland Clinic hospital. Kneina was pronounced dead at the hospital. (Tr. 248.) According to Scott, Kneina was not armed, and Reid immediately disappeared from

the hospital emergency room after they arrived. (Tr. 246.) Scott described the incident to police at the hospital and at the homicide unit of the Cleveland Police Department.

{¶ 10} Leroy Presock ("Presock") lived next door to Scott on Caine Avenue. He testified that he was waking up at approximately 7:00 or 7:30 a.m. when he "heard a young lady yell." (Tr. 290.) Thereafter, Presock went outside and was drinking coffee on his front porch when a neighbor across the street approached him and asked if he had heard gunshots. Presock remained on his porch until the police arrived and did not investigate the source of the gunshots. (Tr. 291.) Presock told police that he heard a total of three gunshots. (Tr. 299.)

{¶ 11} Detective Thomas Lascko ("Det. Lascko") testified that he works in the crime-scene and records unit of the Cleveland Police Department. He responded to Scott's home on Caine Avenue to collect and document evidence. He testified that he found a pocketknife and a pair of glasses on the ground outside the house with blood on them. The pocketknife was only partially open. (Tr. 287.) Police also found one spent 10 mm cartridge case at the scene. (Tr. 643.)

{¶ 12} Officer Bryan Peters ("Officer Peters") of the Cleveland Police Department responded to Marymount Hospital where he met Scott. Scott told him that her boyfriend had shot her sister. (Tr. 304.) She also told Officer Peters that Reid fired a total of two gunshots. (Tr. 314.) Based on Scott's statements to police, Reid became a suspect in the case. (Tr. 315.)

{¶ 13} Jonathan Dayton ("Det. Dayton"), a homicide detective with the Cleveland Police Department, testified that he recovered surveillance videos from Marymount Hospital. One video shows Reid carrying Kneina's body into the hospital and placing her on a wheelchair. (State's exhibit No. 56.) Three other videos show Reid exiting the hospital, "running from the emergency room," and running toward an RTA bus. (State's exhibit Nos. 57, 58, and 59.)

{¶ 14} Vesna Piscitello ("Piscitello"), a civilian analyst with the Cleveland Police Department's Real Time Crime Center ("RTCC"), received a report that Reid exited an RTA bus near East 131st and Miles Avenue at 7:57 a.m. Piscitello tracked Reid's location on RTCC cameras, and she observed him take a second bus from Miles Avenue to the Lee and Harvard intersection a little after 8:00 a.m. (Tr. 510-511.)

{¶ 15} Scott provided the police with Reid's cell phone number, which police also used to track Reid's location. (Tr. 624.) Detective Erin O'Donnell, the lead homicide detective on the case, testified that Reid's cell phone "pinged" in the area of Glendale Avenue in Cleveland. (Tr. 728.) Based on Piscitello's observations of Reid getting off a bus near Glendale Avenue and the location of Reid's phone near the residence, they obtained a search warrant for Reid's mother's home. (Tr. 568, 572, and 732.)

{¶ 16} During the search, police recovered the clothes and shoes Reid was wearing in the Marymount Hospital surveillance videos, a black Glock 10 mm auto caliber semiautomatic handgun, and multiple cell phones, including a black iPhone

that belonged to Reid. (Tr. 579, 581-583, and 586.) Reid was also arrested at the Glendale home when the search warrant was executed. (Tr. 735.)

{¶ 17} Curtiss Jones ("Jones"), a supervisor in the trace-evidence unit of the Cuyahoga County Medical Examiner's Office, testified that he examined the clothes seized from the Glendale home. He also examined the clothes Kneina was wearing at the time she was shot and killed. Jones testified that he looked for fouling, a type of gunshot residue, on Kneina's clothes, wig, and headband because it is useful for determining whether the gun used to kill her was fired from close proximity. Based on his examination, he concluded there was nothing to indicate that the shooter was in close proximity to her at the time of the shooting. (Tr. 476.) He explained that the absence of gunshot residue on the victim indicates it was "a distance shot." (Tr. 476.)

{¶ 18} Jones testified that he found blood staining on Reid's green and black jacket. He explained that the blood staining was indicative of saturation rather than spatter. (Tr. 485.) Blood found on Reid's shoes was also indicative of a "drip stain" rather than blood spatter. (Tr. 488.) Finally, Jones found gunshot-primer residue on the sleeve cuffs of Reid's jacket. (Tr. 486.) Jones explained that gunshot-primer residue is different from regular gunshot residue because it is "formed from the shooting of a gun." (Tr. 486.) The presence of gunshot-primer residence on Reid's sleeve cuffs indicated that Reid shot a gun while he was wearing the green and black jacket. (Tr. 486.)

{¶ 19} Marissa Esterline ("Esterline"), a DNA analyst with the Cuyahoga County Regional Forensic Science Laboratory, testified that DNA found on the Glock recovered from the Glendale residence matched Reid's DNA. (Tr. 688.) James Kooser ("Kooser"), a firearm and toolmarks examiner with the Cuyahoga County Medical Examiner's Office, determined that the 10 auto cartridge casing found at Scott's home on Caine Avenue was fired from the Glock 10 mm auto caliber pistol taken from Reid's mother's home on Glendale. (Tr. 643-644 and 712.)

{¶ 20} Dr. Thomas Gilson, Chief Medical Examiner of the Cuyahoga County Medical Examiner's Office, performed the autopsy on Kneina's body. He concluded that she died of a single gunshot wound to the head, skull, and brain and ruled her death a homicide. (Tr. 414-415.) Dr. Gilson testified that there was no soot or stippling, which indicates the gun was not fired within a few feet of the victim. (Tr. 420.) He also stated that the bullet traveled in a straight line through her left temple and exited from her right temple. (Tr. 420.)

{¶ 21} Det. O'Donnell submitted Reid's black iPhone to the Secret Service for data extraction. (Tr. 737-740.) The Secret Service extracted the data and generated a report of its contents. (Tr. 742-765.) Among other things, the report showed that Reid's phone was used to search "types of murders" and "Marymount Hospital" on the day of the shooting. (Tr. 762-763.) A screenshot of the phone extraction also showed a message to an account called Instagram Fight Back, asking, "Yo, What lawyer you f*** with? Money ain't no problem." (Tr. 764.)

{¶ 22} The State dismissed the domestic-violence charge alleged in Count 4. At the conclusion of the trial, the jury found Reid guilty of murder with one- and three-year firearm specifications as alleged in Count 1 and two counts of felonious assault with one- and three-year firearm specifications as alleged in Count 2 and 3.

{¶ 23} On April 8, 2025, the trial court sentenced Reid to 15 years to life on the murder conviction in Count 1, to be served prior to and consecutive with the attendant three-year firearm specification for a total of 18 years to life in prison. The court also sentenced Reid to a three-year firearm specification attendant to Count 2, but the underlying felonious assault charges alleged in Counts 2 and 3 merged with the murder conviction alleged in Count 1. The three-year firearm specification attendant to Count 2 was ordered to be served consecutively to Reid's sentence on Count 1 for an aggregate sentence of 21 years to life.

{¶ 24} On May 29, 2025, Reid pleaded guilty to one count of discharging a firearm on or near a prohibited premises as alleged in Count 6 and one count of intimidation of an attorney, victim, or witness in a criminal case as alleged in Count 7. The court sentenced him to one year in prison on each count to be served concurrently with his 21-year-to-life sentence on Count 1. This appeal followed.

## II. Law and Analysis

### A. Manifest Weight of the Evidence

{¶ 25} In the first assignment of error, Reid argues his convictions are against the manifest weight of the evidence.

{¶ 26} When reviewing a manifest-weight challenge, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 2022-Ohio-1397, ¶ 54 (8th Dist.), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Martin* at 175.

{¶ 27} Reid argues his convictions are against the manifest weight of the evidence because Scott's testimony was not credible. He contends Scott was not credible because (1) Scott's statement that Reid parked across the street does not make sense under the circumstances; (2) she testified that she heard gravel when Reid pulled his vehicle onto her grass but the pictures of her house show there is no gravel in the lawn; and (3) Presock's testimony contradicts Scott's testimony because he only heard a female voice, and Scott testified that she was arguing with Reid, who has a male voice.

{¶ 28} However, just because Reid's car was not parked on Scott's property does not make the testimony untrue. There was no evidence contradicting Scott's testimony that Reid's car was parked across the street. And whether or not there was actual gravel on Scott's property is of no consequence. The important fact is

that Scott heard a noise sounding like gravel that caused her to look out the window and see that Reid parked his vehicle on the lawn. The police photographs that were entered into evidence corroborate Scott's testimony that he parked the car on the grass because Reid's car was still there when police arrived. (*See* State's exhibit Nos. 61 and 63.)

{¶ 29} Further, just because Presock did not hear Reid fighting with Scott does not mean that he did not fight with her. It is possible that Reid argued with Scott inside the house and that Presock could not hear Reid, but he heard Scott's voice outside. Moreover, the location of Reid's car, whether or not the sound of a car driving on the grass sounds like gravel kicking up, and whether Presock heard Reid's voice are not relevant to the material issues in the case.

{¶ 30} Reid nevertheless argues that the physical evidence presented was not consistent with Scott's testimony. Reid first argues that while Scott testified that she started to dress herself in a one-piece jumper by the window, photos of her home do not show a jumper anywhere. Reid also argues that the only cartridge casing found at the scene was located on the opposite side of Reid's vehicle from where Scott indicated he was standing. However, where Scott placed the one-piece jumper is a minor detail not relevant to whether Reid killed Kneina. Nor is the location where Reid was standing an issue of material fact.

{¶ 31} "Minor inconsistencies do not render testimony incredible, nor do they transform a conviction into a manifest miscarriage of justice." *State v. Price*, 2026-Ohio-688, ¶ 32 (5th Dist.), citing *State v. Craig*, 2000 Ohio App. LEXIS 1138,

*10 (10th Dist. Mar. 23, 2000). This court has held that "minor inconsistencies in witness testimony will not render a conviction so against the manifest weight of the evidence as to cause a miscarriage of justice." *State v. Weems*, 2016-Ohio-701, ¶ 29-30 (8th Dist.).

{¶ 32} The surveillance videos from Marymount Hospital and the 911 audio recording depict Scott screaming hysterically because her sister had just been shot in the head. It is reasonable to conclude that she might not remember insignificant details such as where she placed her one-piece jumper or where Reid was standing. Surveillance videos from Marymount Hospital show that Reid fled from the hospital and went to his mother's house where he googled "types of murders" and "Marymount Hospital." These inquiries, which Reid made immediately after leaving the hospital, suggest consciousness of guilt. The surveillance videos also show Reid wearing the green and black jacket that was later recovered from his mother's home and was found to have gun-primer residue on the sleeves, indicating that Reid had recently fired a weapon while wearing that jacket.

{¶ 33} Other physical evidence established that the cartridge case found at the crime scene was fired from the Glock 10 mm auto caliber handgun recovered from Reid's mother's house and that Reid's DNA was found on it. Evidence of gun-primer residue on Reid's jacket sleeves coupled with evidence that the cartridge case found at the scene was fired from Reid's 10 mm Glock is substantially more probative than Scott's testimony about where he was standing on her property, where Scott placed her jumper, or whether Presock heard Reid's voice.

{¶ 34} After reviewing the evidence presented at trial, we cannot conclude that in resolving any conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that Reid's convictions must be reversed. Accordingly, the first assignment of error is overruled.

### B. Self-Defense Instruction

{¶ 35} In the second assignment of error, Reid argues the trial court erred by failing to provide a self-defense instruction.

{¶ 36} We review a trial court's refusal to give a particular jury instruction for an abuse of discretion. *State v. Daniel*, 2016-Ohio-5231, ¶ 30 (8th Dist.), citing *State v. Leonard*, 2013-Ohio-1446, ¶ 33 (8th Dist.). An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 37} However, "a trial 'court does not have discretion to misapply the law.'" *Morgan v. Greater Cleveland Regional Transit Auth.,* 2025-Ohio-1655, ¶ 64 (8th Dist.), quoting *Johnson* at ¶ 38. "Thus, an abuse of discretion also occurs when a court "'applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact.'" *Id.*, quoting *Thomas v. Cleveland*, 2008-Ohio-1720, ¶ 15 (8th Dist.), quoting *Berger v. Mayfield*, 265 F.3d 399 (6th Cir. 2001).

{¶ 38} A requested jury instruction should be given if it contains a correct statement of the law, is appropriate to the facts, and reasonable minds might reach the conclusion sought by the instruction. *Murphy v. Carrollton Mfg. Co.*, 61 Ohio

St.3d 585, 591 (1991); *State v. Nelson*, 36 Ohio St.2d 79 (1973), paragraph one of the syllabus. However, the trial court should not instruct the jury where there is no evidence to support a particular issue. *State v. Williams*, 2011-Ohio-5385, ¶ 32 (8th Dist.), citing *Riley v. Cincinnati*, 46 Ohio St.2d 287 (1976).

{¶ 39} R.C. 2901.05(B)(1) governs self-defense and states, in relevant part:

> A person is allowed to act in self-defense . . . . If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense . . . the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense[.]

{¶ 40} Thus, the defendant bears the initial burden of production, which is the burden of producing evidence "that tends to support" that the defendant used the force in self-defense. *State v. Davidson-Dixon*, 2021-Ohio-1485, ¶ 18 (8th Dist.). The defendant can produce evidence to support his or her claim of self-defense in the State's case-in-chief. *See State v. Hawthorne*, 2018-Ohio-1180, ¶ 21 (8th Dist.) (holding that a defendant does not have to testify in his or her own defense in order to establish the defense of self-defense; "he [or she] may exercise his [or her] right to silence and still prove self-defense through the testimony of other witness"). If the defendant meets his or her initial burden of producing evidence tending to support a claim of self-defense, the burden then shifts to the State to establish its burden of persuasion to prove beyond a reasonable doubt that the defendant did not use force in self-defense. *Davidson-Dixon* at ¶ 18.

{¶ 41} A person may use deadly force in self-defense where he or she (1) was not at fault in creating the situation giving rise to the affray; (2) had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of such force; and (3) did not violate any duty to retreat or avoid the danger. *State v. Messenger*, 2022-Ohio-4562, ¶ 14, citing *State v. Barnes*, 2002-Ohio-68 (2002). To satisfy this burden of proving beyond a reasonable doubt that the defendant did not use force in self-defense, the State must disprove at least one of the elements of self-defense. *Davidson-Dixon* at ¶ 18.

{¶ 42} In deciding whether a self-defense instruction should be given, the trial court must view the evidence in a light most favorable to the defendant without regard to credibility. *Id.* at ¶ 20. If there is conflicting evidence on the issue of self-defense, the instruction must be given to the jury. *Id.* However, "'if the evidence generates only a mere speculation or possible doubt, the evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted.'" *Id.*, quoting *State v. Melchior*, 56 Ohio St.2d 15 (1978).

{¶ 43} The evidence in this case shows that Reid was at fault in creating the situation that gave rise to the shooting. Scott repeatedly asked him to leave and he eventually left her property. However, he immediately returned. At that point, he became a trespasser on Reid's property because he lacked her permission to be there. A trespasser is defined as "[s]omeone who commits a trespass; one who

intentionally and without consent or privilege enters another's property." *Black's Law Dictionary* (11th Ed. 2019).

{¶ 44} Ohio courts have consistently held that a trespasser is not entitled to claim self-defense because by invading the victim's property without permission, the trespasser created the situation giving rise to the affray. *Ellis v. State*, 64 Ohio St.3d 391, 395-396 (1992) ("A trespasser is not entitled to assert self-defense to justify an assault upon another who legitimately used non-lethal force to exclude him from the property."); *State v. White*, 2019-Ohio-4288, ¶ 18 (4th Dist.) (following *Ellis*); *State v. Higgins*, 2002-Ohio-4679, ¶ 19 (2d Dist.) (Trespassing "is inconsistent with the defense of self-defense, because it presupposes that [the defendant] was at fault in creating the situation that gave rise to the altercation."); *State v. Lampkins*, 1993 Ohio App. LEXIS 2617, * 12 (10th Dist. May 18, 1993) (By trespassing on the victim's property, "appellant did do something to cause the affray.").

{¶ 45} The uncontroverted evidence established that Reid was trespassing on Scott's property when he shot and killed Kneina. He had an opportunity to walk away and avoid a conflict, but he dismissed it. In denying Reid's request for a self-defense instruction, the court stated:

> He was told to leave. How do you get around that he came back and this time he has a weapon? . . .
>
> We don't have evidence of anything else. We have evidence that he was there, he was told to leave, he left, and then he came back and . . . if he violated his duty to retreat to avoid the danger, that kills it.

(Tr. 858.) The evidence supports the court's decision that Reid was a trespasser and, therefore, not entitled to a self-defense instruction.

{¶ 46} Accordingly, the second assignment of error is overruled.

## C. Cell Phone Extraction

{¶ 47} In the third assignment of error, Reid argues the trial court erred by allowing the State to introduce information extracted from Reid's cell phone as evidence.

{¶ 48} We review a trial court's decision to admit or exclude evidence for abuse of discretion. *Schleich v. Penn Cent. Corp.*, 2024-Ohio-5005 ¶ 9 (8th Dist.). We, therefore, will not disturb a trial court's evidentiary ruling absent an abuse of discretion. *In re A.M.*, 2022-Ohio-612, ¶ 22 (8th Dist.).

{¶ 49} Reid argues the trial court erred in admitting information extracted from his phone into evidence because Det. O'Donnell, the witness who testified about the information, did not perform the extraction and she did not have personal knowledge as to how the information was extracted. Reid contends that without personal knowledge, Det. O'Donnell could not properly authenticate the extracted information.

{¶ 50} Evid.R. 901 governs the authentication of evidence prior to its admissibility and states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). Evid.R. 901(B)(1) further provides that evidence may be properly authenticated by testimony of a witness with knowledge that "a matter is what it is claimed to be." Authentication under Evid.R. 901(A) is a low threshold standard that does not

require conclusive proof of authenticity. *State v. Horton*, 2015-Ohio-99, ¶ 19 (8th Dist.), citing *State v. Freeze*, 2012-Ohio-5840, ¶ 65 (12th Dist.). The State need only demonstrate a "reasonable likelihood" that the evidence is authentic. *State v. Dobson*, 2025-Ohio-2148, ¶ 30 (8th Dist.), citing *State v. Roseberry*, 2011-Ohio-5921, ¶ 65 (8th Dist.).

{¶ 51} Det. O'Donnell collected the phone during the search of Reid's mother's house, and she gave it to the Secret Service to conduct the Cellebrite extraction. She demonstrated that she was familiar with how the extraction reports are generated, and she testified as to what the electronically generated printouts were and what they claimed to be. (Tr. 743-766.) Moreover, Det. O'Donnell verified the information provided in the extraction. (Tr. 744-750.) She testified, in relevant part:

> Q: When you open a cell phone extraction, do you look to try to see if the actual extraction I'm looking at matches the information I sent to the Secret Service and the information that the Secret Service said they sent back to me?
>
> A: Yes.

(Tr. 746.) Det. O'Donnell explained that "[e]ach cell phone has a distinct fingerprint" known as the "IMEI number." (Tr. 736.) She also explained that when she submitted Reid's phone for extraction, she put specific identifying information on the evidence envelope to make sure the extraction matches the device she submitted. (Tr. 740-744.) In this case, the evidence was marked with the case number and the cell phone's IMEI number. (Tr. 743.)

{¶ 52} Det. O'Donnell was not testifying as an expert on the inner workings of the phone; she was merely describing the information she obtained from the phone and the method she used to verify that it came from Reid's phone. Given the low threshold required by Evid.R. 901(B)(1) to demonstrate that the "matter is what it is claimed to be," we find that Det. O'Donnell's verification of the contents of the cell phone extraction was sufficient for authentication purposes. *See*, *e.g.*, *State v. Lautenan*, 2023-Ohio-1945, ¶ 58-62 (11th Dist.) (Although FBI agent did not create cell phone-extraction reports, he properly authenticated them by demonstrating that he was familiar with the extracted content.).

{¶ 53} Reid nevertheless argues that even if the extracted cell phone data was properly authenticated, evidence that he messaged a friend to retain an attorney was more prejudicial than probative and should have been excluded. To be admissible as relevant, evidence must have a tendency "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. However, even relevant evidence must be excluded under Evid.R. 403(A) "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶ 54} "In reaching a decision involving admissibility under Evid.R. 403(A), a trial court must engage in a balancing test to ascertain whether the probative value of the offered evidence outweighs its prejudicial effect." *State v. Wright*, 2019-Ohio-

4460, ¶ 50 (8th Dist.), citing *State v. Maurer*, 15 Ohio St.3d 239 (1984), paragraph seven of the syllabus.

{¶ 55} "'When determining whether the relevance of evidence is outweighed by its prejudicial effects, the evidence is viewed in a light most favorable to the proponent, maximizing its probative value and minimizing any prejudicial effect to the party opposing admission.'" *Bromall v. Select Specialty Hosp.*, 2022-Ohio-2496, ¶ 55 (8th Dist.), quoting *State v. Lakes*, 2007-Ohio-325, ¶ 22 (2d Dist.).

{¶ 56} "Unfair prejudice does 'not mean the damage to a [party's] case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis.'" *State v. Lang*, 2011-Ohio-4215, ¶ 89, quoting *United States v. Bonds*, 12 F.3d 540 (6th Cir. 1993). "'Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision.'" *Bromall* at ¶ 56, quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172 (2001). It is evidence that "'arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish'" and generally "'appeals to the jury's emotions rather than intellect.'" *Oberlin* at 172, quoting *Weissenberger's Ohio Evidence*, § 403.3, at 85-87 (2000).

{¶ 57} The court allowed evidence of an Instagram message from Reid to a friend asking for the name of an attorney. He argues this evidence was not probative of guilt or innocence and that, therefore, its probative value was outweighed by the danger of unfair prejudice. (Appellant's brief at 16.) We agree the probative value of this evidence is outweighed by the danger of unfair prejudice and that the trial

court erroneously admitted the Instagram message into evidence. We nevertheless find the error harmless.

{¶ 58} Crim.R. 52(A) defines "harmless error" as "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Under the harmless-error standard of review, "the government bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." *State v. Perry*, 2004-Ohio-297, ¶ 15, citing *United States v. Olano*, 507 U.S. 725, 741 (1993).

{¶ 59} To be viewed as "affecting substantial rights," the error must have been prejudicial, meaning "'[i]t must have affected the outcome of the [trial] court proceedings.'" *State v. Fisher*, 2003-Ohio-2761, ¶ 7, quoting *Olano*. In other words, Crim.R. 52(A) asks whether the rights affected are "substantial" and, if so, whether a defendant has suffered any prejudice as a result. *State v. Morris*, 2014-Ohio-5052, ¶ 24-25.

{¶ 60} As previously stated, Scott testified that Reid shot and killed Kneina. And, Reid's DNA was found on the murder weapon. The murder weapon was recovered from his mother's house, and subsequent ballistics testing established that the cartridge casing found at the crime scene matched Reid's Glock 10 mm auto caliber semiautomatic handgun. Surveillance video from Marymount Hospital showed Reid carrying Kneina's body into the hospital and showed him running away immediately thereafter. Police recovered the clothes Reid was wearing in the surveillance videos, and forensic testing showed that the clothes were saturated with

blood.  Therefore, even if the Instagram message were excluded from the evidence, the outcome of the trial would have been no different.

{¶ 61} The third assignment of error is overruled.

### D. Request for Counsel

{¶ 62} In the fourth assignment of error, Reid argues the trial court violated his right to a fair trial by allowing the State to elicit testimony that he sought an attorney prior to his arrest.  He contends this evidence violated his Sixth Amendment right to counsel and his Fifth Amendment right to remain silent.

{¶ 63} The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. Const., Amend. VI.  However, "[u]nder the plain language of the Sixth Amendment, the right to counsel belongs to an accused and does not attach until a criminal prosecution has commenced." *State v. Taylor*, 2024-Ohio 1752, ¶ 22, citing *Rothgery v. Gillespie Cty., Texas*, 554 U.S. 191, 198 (2008).

{¶ 64} A criminal prosecution is commenced by "'the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Id.*, quoting *Rothgery* at *id.*  But courts will not construe every mention of an attorney as an invocation of the right to counsel.  *Gorel v. United States*, 531 F.Supp. 368, 371 (S.D.Tex. 1981).  The court must look at the totality of the circumstances to determine whether the inquiry about an attorney was either an attempt to invoke the Sixth Amendment right to

counsel or an inquiry about securing an attorney at some point in the future. *State v. Gladding*, 66 Ohio App.3d 502, 508 (11th Dist. Mar. 5, 1990.) ("[A] telephone call to an attorney is not necessarily tantamount to a request for present assistance of counsel.").

{¶ 65} Reid messaged a friend for the name of an attorney before his mother's home was searched, before he was arrested, and before any criminal prosecution had been initiated. He asked the friend for the name of an attorney before he was in police custody. Therefore, Reid's request for the name of an attorney was not an invocation of his Sixth Amendment right to counsel and can only be construed as an effort to obtain the information for purposes of a prosecution that had not yet commenced. The evidence, therefore, did not infringe on Reid's Sixth Amendment right to counsel.

{¶ 66} Reid nevertheless argues that using evidence of his desire for counsel to show consciousness of guilt violates the right to remain silent embodied in the Fifth Amendment of the United States Constitution.[1] He cites *State v. Leach*, 2004-Ohio-2147, and *Martin v. State*, 364 Md. 692 (2001), in support of his argument.

{¶ 67} In *Leach*, the Ohio Supreme Court addressed the question of whether the use of a defendant's prearrest silence as substantive evidence of guilt violated the Fifth Amendment. The Court noted that the United States Supreme Court had not, at that time, addressed this question. Relying on decisions from the Fifth,

---

[1] The Fifth Amendment to the United States Constitution states that no person "shall be compelled in any criminal case to be a witness against himself." It applies to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964).

Ninth, and Eleventh Circuits, the Court held that the State violated the defendant's Fifth Amendment privilege against self-incrimination when it introduced evidence in its case-in-chief that, before arrest, the defendant remained silent and/or asserted his right to counsel in response to questioning. *Id*. at ¶ 38. The Court concluded that allowing the factfinder to consider the defendant's silence as evidence of guilt undermined the right against self-incrimination guaranteed by the Fifth Amendment. *Id*. at ¶ 31.

{¶ 68} In *Martin*, a police officer was charged with committing theft while in the line of duty. *Id*. at 695-697. After consulting with an attorney, the police officer resigned from the police force. *Id*. at 703. The trial court allowed the State to draw an inference of guilt from the defendant's consultation with an attorney. *Id*. at 707. The Maryland Supreme Court held that evidence of the defendant's consultation with an attorney was prejudicial and was admitted in error. *Id*. at 708.

{¶ 69} However, "prosecutors may use a defendant's pre-arrest silence as substantive evidence of his guilt if the defendant did not expressly invoke his right to remain silent." *Abby v. Howe*, 742 F.3d 221, 228 (6th Cir. 2014), citing *Salinas v. Texas*, 570 U.S. 178, 183 (2013).

{¶ 70} The *Salinas* Court reasoned that the privilege against self-incrimination "'generally is not self-executing'" and that a witness who desires its protection "'must claim it.'" *Id*. at 181, quoting *Minnesota v. Murphy*, 465 U.S. 420, 425, 427 (1984), quoting *United States v. Monia*, 317 U.S. 424, 427 (1943). The court further explained that "forfeiture of the privilege against self-incrimination

need not be knowing." *Id*. at 190. "Statements against interest are regularly admitted into evidence at criminal trials . . . and there is no good reason to approach a defendant's silence any differently." *Id*. Therefore, with certain exceptions not applicable there, none of the protections guaranteed by the Fifth Amendment are available unless or until the defendant explicitly invokes the privilege. *Id*.

{¶ 71} Neither *Leach* nor *Martin* are analogous to the case at bar. *Leach* involved a prearrest, pre-*Miranda* invocation of the right to remain silent and a postarrest invocation of the right to counsel. And *Martin* involved an actual consultation with an attorney. Reid merely sent a message to a friend seeking the name of an attorney. Reid was not under arrest and no criminal prosecution had begun. Moreover, Reid never invoked either his Fifth Amendment right to remain silent or his Sixth Amendment right to counsel. Reid's message seeking the name of an attorney is akin to a statement against interest, which the *Salinas* Court held was regularly admitted into evidence. *Salinas* at 190. We, therefore, find no error in the admission of Reid's cell phone message.

{¶ 72} The fourth assignment of error is overruled.

### E. Jail-Time Credit

{¶ 73} In the fifth assignment of error, Reid argues the trial court erred in failing to properly calculate and apply jail-time credit. Reid does not argue how much credit should have been awarded, only that the proper amount was not given. Failure to apply jail-time credit is reversible error. *State v. Hunter,* 2008-Ohio-6962, ¶ 16 (10th Dist.) (applying plain error analysis to failures to raise errors in jail-

time credit calculations); *State v. Abdullah*, 2020-Ohio-4813, ¶ 41 (7th Dist.) ("Plain error exists where a trial court fails to accurately calculate jail-time credit."); *State v. Thompson*, 2015-Ohio-3882, ¶ 23 (8th Dist.) ("A trial court's failure to award jail-time credit constitutes an error that may be addressed on appeal.").

{¶ 74} The trial court stated at the sentencing hearing that "credit will be given for all time served." (Tr. 979.) However, it never applied any jail-time credit, and the State concedes this fact.

{¶ 75} Therefore, the fifth assignment of error is sustained.

## F. Cumulative Error

{¶ 76} In the sixth assignment of error, Reid argues that cumulative errors deprived him of a fair trial.

{¶ 77} Under the cumulative-error doctrine, a conviction may be reversed when the cumulative effect of nonprejudicial errors "deprives a defendant of a fair trial even though each of the instances of trial-court error does not individually constitute cause for reversal." *State v. Garrett*, 2022-Ohio-4218, ¶ 270, citing *State v. Powell*, 2012-Ohio-2577, ¶ 223. "However, the doctrine of cumulative error is inapplicable when the alleged errors are found to be harmless or nonexistent." *State v. Allen*, 2016-Ohio-102, ¶ 53 (8th Dist.), citing *State v. Brown*, 2003-Ohio-5059, ¶ 48.

{¶ 78} We overruled the first four assignments of error because we did not find any errors in the trial. Although the trial court made a minor error with respect to Reid's jail-time credit, that error occurred after trial and did not affect the fairness

of the trial. In the absence of any errors during the trial, we overrule the sixth assignment of error.

{¶ 79} Judgment affirmed, and case remanded to the trial court for the limited purpose of calculating and applying jail-time credit.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence and to calculate jail-time credit.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, PRESIDING JUDGE

MICHAEL JOHN RYAN, J., CONCURS;
KATHLEEN ANN KEOUGH, J., CONCURS IN PART AND CONCURS IN JUDGMENT ONLY IN PART (WITH SEPARATE OPINION)


KATHLEEN ANN KEOUGH, J., CONCURRING IN PART AND CONCURRING IN JUDGMENT ONLY IN PART:

{¶ 80} I fully concur with the majority's resolution of Reid's assignments of error, except the fourth assignment of error. Although I would find error, I would nonetheless conclude the error to be harmless. Accordingly, I concur in judgment only regarding Reid's fourth assignment of error.

{¶ 81} I agree with the majority that the trial court committed error in admitting the Reid's Instagram message inquiring about a lawyer because the probative value did not outweigh the danger of unfair prejudice. As the majority concluded the error was harmless because of the other admissible evidence.

{¶ 82} In addressing Reid's fourth assignment of error — whether the admission of the Instagram message violated his Sixth Amendment right to counsel — the majority found no error or violation. Although I agree with overruling Reid's fourth assignment of error, I would do so under a harmless-error analysis. I also do not find the discussion in the majority opinion about the Fifth Amendment necessary nor do I find *Salinas*, 570 U.S. 178 (2013), applicable.

{¶ 83} In *Salinas*, the police suspected the defendant's involvement in two murders and asked the defendant to come to the police station. The defendant voluntarily went to the police station, and the police asked him questions about the case. It was established that the defendant was not in police custody, he was free to leave, and thus not Mirandized. Although he voluntarily answered some questions, the defendant did not respond when the police asked him whether ballistics testing would have matched his firearm to shell casings found at the crime scene. At trial, the prosecution used the defendant's silence as evidence of guilt. The *Salinas* Court found that the Fifth Amendment privilege against self-incrimination is not self-executing and must be expressly invoked — simply remaining silent is insufficient to claim Fifth Amendment protections. Accordingly, the *Salinas* Court found that because the defendant did not expressly invoke the privilege during the non-

custodial interview, the prosecution's use of his silence did not violate his Fifth Amendment right.

{¶ 84} In my opinion, any discussion about the Fifth Amendment is not applicable to this assignment of error. In *Salinas*, the case involved a prearrest, noncustodial conversation with law enforcement. Because the *Salinas* defendant did not invoke the Fifth Amendment during that voluntary meeting, the court found no violation.

{¶ 85} Here, we have an Instagram message that Reid sent to a friend inquiring about an attorney; law enforcement was not involved in this conversation. I cannot comprehend how Reid could invoke his Fifth Amendment right to remain silent in a text message to a friend.

{¶ 86} Rather, I find this case akin to the line of cases Reid cites in his appellate and reply briefs concerning the State using as evidence of guilt or consciousness of guilt a defendant seeking, consulting, or inquiring about an attorney prior to arrest. *See State v. Angel T.*, 292 Conn. 262 (2009); *Zemina v. Solem*, 438 F. Sup. 455 (D.S.D. 1977), *aff'd*, 573 F.2d 1027 (8th Cir. 1978); *State v. Santiago*, 100 Conn.App. 244-45 (2007); *Henderson v. United States*, 632 A.2d 419 (D.C. App. 1993); *People v. Meredith*, 84 Ill.App.3d 1065 (1980); *State v. Marshall*, 123 N.J. 1 (1991*); State v. Foth*, 1996 Ohio App. LEXIS 3445 (10th Dist. Aug. 15, 1996); *United States v. Liddy*, 509 F.2d 444 (D.C. Cir. 1974). In each of these cases cited, the prosecution commented to the jury about the defendant's retention of, consultation with, or request for an attorney. The respective courts found that in

these situations, the prosecution cannot invite the jury to draw an adverse inference about the defendant's guilt because the defendant sought counsel. The respective courts found that this commentary infringed on a defendant's constitutional right to counsel.

{¶ 87} Furthermore, in *Sizemore v. Fletcher*, 921 F.2d 667, 671 (6th Cir. 1990), the court stated, "A prosecutor may not imply that an accused's decision to meet with counsel, even shortly after the incident giving rise to a criminal indictment, implies guilt."

{¶ 88} In a recent Tennessee appellate decision, *State v. Sullivan*, 2024 Tenn. Crim. App. LEXIS 20 (Jan. 24, 2024), the court addressed the perils of the prosecution using evidence of a defendant's consultation with a lawyer before arrest or before charges are even filed. In *Sullivan*, the defendant was on the phone with his son when officers appeared on scene. As this call continued, the officers asked the defendant of his whereabouts, to which he replied, "I'm headed to my lawyer's office." The trial court allowed the State to introduce this statement into evidence.

{¶ 89} The *Sullivan* defendant appealed, challenging the trial court's decision, stating the evidence infringed on his Sixth Amendment right to counsel and further, was overly prejudicial. In discussing the assignment of error, the *Sullivan* Court noted other courts that have held that the Due Process Clause of the Fourteenth Amendment prohibits the prosecution's discussion of a defendant seeking legal counsel before the initiation of formal charges or custodial interrogation. *Id.* at *29, citing *Commonwealth v. Nolin*, 448 Mass. 207 (2007);

*State v. Dixon*, 279 Kan. 563 (2005), *disapproved of on other grounds by State v. Wright*, 290 Kan. 194 (2010).

> The reason for this prohibition is simple: this evidence "is likely to give rise to the improper inference that a defendant in a criminal case is, or at least believes himself to be, guilty" because "he had done something for which he needed a lawyer to defend him." *State v. Angel T.*, 292 Conn. 262, 973 A.2d 1207, 1221 (Conn. 2009); *Martin v. State*, 364 Md. 692, 775 A.2d 385, 394 (Md. 2001) ("Evidence of a criminal defendant's consultation with an attorney is highly prejudicial, as it is likely to give rise to the improper inference that a defendant in a criminal case is, or at least believes himself to be, guilty.").
>
> For these reasons, the State must tread carefully before seeking admission of any evidence that the accused sought legal advice or tried to meet with a lawyer before charges are brought.

*Id.* at * 29.

{¶ 90} The court also focused on the relevance of the statement and whether a jury instruction should have been given to guide the jury's consideration of the evidence, that it could not be used as an inference of guilt. The court found it a "significant concern" that "the jury was left without any proper guidance about how to consider and evaluate the evidence." *Id.* at * 32.

> We remain "mindful that [m]ost jurors . . . are not schooled in the law and that from such evidence and arguments, a juror might easily draw the inference . . . that it was [the defendant's] idea to seek counsel because he had done something for which he needed a lawyer to defend him. Accordingly, we view [e]vidence of a criminal defendant's consultation with an attorney [as] highly prejudicial, as it is likely to give rise to the improper inference that a defendant in a criminal case is, or at least believes himself to be, guilty."

*Id.*, quoting *Angel T.*, 292 Conn. at 283.

{¶ 91} The *Sullivan* Court found that the prosecution's use of the statement created an improper inference of guilt but ultimately found the prosecution's use of

the evidence harmless because the evidence of the defendant's guilt was overwhelming and the State did not use the defendant's statement during closing arguments. The court found that "while the jury was left with an inference of guilt, the State did not compound the error by making an argument [at closing] supporting this theory." *Id*. at *35.

{¶ 92} In the case before us, the State used Reid's text message for the improper purpose that *Sullivan* and the other courts determined infringed on a defendant's right to counsel — an improper inference of guilt. And this inference of guilt was compounded by the State's closing argument:

> Finally, he wants to know from an Instagram message, he's in a jam, he needs a lawyer, and the most important thing here is that he wants a lawyer to get him off because money ain't no problem.
>
> What does that tell you? It's the State's position when you're looking at the evidence and using your reason and common sense and evaluating it in that capacity that the evidence that the detectives collected confirms the information that was received.
>
> And the law that is given to you is the law that you must apply in this case. And when you use your reason and common sense, you will be able to find that the defendant is guilty of all three counts in this indictment.

(Tr. 901.)

{¶ 93} In my opinion, these comments undoubtedly invited the jury to infer that Reid's search for an attorney was indicative of his guilt. I would find that these comments impermissibly infringed on Reid's Sixth Amendment right to counsel.

{¶ 94} Despite this violation, I would find the error harmless for the reasons as previously discussed in the majority opinion discussing Reid's third assignment

of error. But I once again question why the State continues to use problematic evidence in their case-in-chief when that evidence is entirely not necessary to satisfy its burden of proof. In *State v. Keller*, 2018-Ohio-4107 (8th Dist.), and *State v. Lindsey*, 2019-Ohio-782 (8th Dist.), this court questioned the State's tactics of using improper testimony and evidence and found in both cases that "[u]nder different circumstances, this tactic could be reversible error." *Keller* at ¶ 50 and *Lindsey* at ¶ 52.

{¶ 95} In this case, the State did not need to use the Instagram message to prove its case against Reid. As the majority opinion conclusively demonstrates, the evidence without the use of the message was overwhelming of Reid's guilt. Fortunately for the State, this is not the case where the Instagram message was so overly prejudicial to jeopardize its entire case. But I would caution the State to consider the prejudicial effect of certain evidence and whether its introduction is worth the risk.